PEOPLE v KEVORKIAN

HOBBINS v ATTORNEY GENERAL

Docket Nos. 99591, 99674, 99752, 99758, 99759. Argued October 4, 1994 (Calendar No. 1). Decided December 13, 1994. Certiorari denied by the Supreme Court of the United States on April 24, 1995, 514 US — (1995).

Jack Kevorkian, M.D., was charged in separate cases in the Wayne and Oakland Circuit Courts with assisting in the suicides of three people, MCL 752.1027; MSA 28.547(127), and also was charged in the Oakland Circuit Court with open murder arising out of assisting the suicides of two other people before the enactment of the assisted suicide statute. In each case, the charges were dismissed.

The Wayne Circuit Court, Richard C. Kaufman, J., found that the assisted suicide statute impermissibly burdened the due process interest in the decision to end one's life. The Oakland Circuit Court, Jessica R. Cooper, J., concluded that, while a person has the right to commit suicide, an assistor, such as the defendant, lacks standing to challenge the statute, but found the statute to be unconstitutional as violative of the Title-Object Clause of the Michigan Constitution and because its purpose was changed during passage. In the case involving the open murder charges, the court, David F. Breck, J., concluded that assisting a suicide was not murder.

In the Wayne County case, the Court of Appeals, FITZGERALD, P.J. (D. E. SHELTON, and TAYLOR, JJ., concurring in part and dissenting in part), affirmed the dismissal of the assisting charges, but reversed with respect to the constitutionality of the right to commit suicide and of the statute (Docket No. 171056). The people appeal, and the defendant cross appeals.

In the Oakland County cases, the Court of Appeals, FITZGERALD, P.J. (D. E. SHELTON, and TAYLOR, JJ., concurring in part and dissenting in part), affirmed the decision regarding the assisted suicide statute (Docket No. 172399), and the people

REFERENCES

Am Jur 2d, Homicide § 585.

Criminal liability for death of another as result of accused's attempt to kill self or assist another's suicide. 40 ALR4th 702.

appeal. In the open murder case, the Court of Appeals, FITZGERALD, P.J., and TAYLOR, J. (D. E. SHELTON, J., dissenting), reversed, reinstating the charges (Docket No. 154740), and the defendant appeals.

Teresa Hobbins and others sought a declaration in the Wayne Circuit Court that the assisted suicide statute was unconstitutional. The court, Cynthia D. Stephens, J., concluded that the statute violated Const 1963, art 4, § 24, because it did not have a single object and there was a change in the purpose of the bill during its passage. The court further found a due process right to commit suicide. The Court of Appeals, FITZGERALD, P.J. (D. E. SHELTON, and TAYLOR, JJ., concurring in part and dissenting in part), affirmed the decision that the statute was unconstitutional, but reversed with respect to the decision that the constitution protects the right to commit suicide, concluding that the state is free to criminalize assisting a suicide (Docket No. 164963). The parties appeal.

In a memorandum opinion, the Supreme Court *held:*

The assisted suicide provisions of MCL 752.1027; MSA 28.547(127) were validly enacted and do not violate the Title-Object Clause of the Michigan Constitution. The United States Constitution does not prohibit a state from imposing criminal penalties for assisting a suicide. In the murder case, the common-law definition of murder does not encompass the act of intentionally providing the means by which a person commits suicide. Only where there is probable cause to believe that death was the direct and natural result of a defendant's act can the defendant be properly bound over on a charge of murder. Where a defendant merely is involved in the events leading up to the death, such as providing the means, the proper charge is assisting in a suicide, which may be prosecuted as a common-law felony under the saving clause, MCL 750.505; MSA 28.773, in the absence of a statute that specifically prohibits assisting a suicide. The motion to quash must be reconsidered by the circuit court to determine if the evidence produced at the preliminary examination was sufficient to bind the defendant over for trial.

Chief Justice CAVANAGH and Justices BRICKLEY and GRIFFIN stated:

Const 1963, art 4, § 24 provides that no law may embrace more than one object, nor may a bill be altered or amended on its passage through either house so as to change its original purpose as determined by its total content. The object of the legislation is to be determined by examining the law as enacted, not as originally introduced. The assisted suicide statute

clearly embraces only one object, and was validly enacted. In addition, the purpose of the statute was not changed during its passage. The test for determining if an amendment or substitute changes a purpose of the bill is whether the subject matter is germane to the original purpose. The creation of the Michigan Commission on Death and Dying and the provision of criminal penalties were appropriately placed in the same bill. Any problems with 1992 PA 270, which originally prohibited assisting a suicide, were eliminated by the enactment of 1993 PA 3, which replaced the former provisions and remedied any constitutional defect in the original act. Thus, the assisted suicide statute is not void as violative of Const 1963, art 4, § 24.

The Due Process Clause of the United States Constitution does not encompass a fundamental right to commit suicide, with or without assistance, regardless of whether the assistant is a physician. The right cannot be inferred from federal case law recognizing a protected liberty interest in the withdrawal of life-sustaining medical treatment. Suicide involves an affirmative act to end life, whereas refusal or cessation of life-sustaining medical treatment permits life to run its course, unencumbered by contrived intervention. The right to commit suicide is neither implicit in the concept of ordered liberty nor deeply rooted in this nation's history and tradition. Rather, it would be an impermissibly radical departure from existing tradition, and from the principles that underlie that tradition, to declare that there is such a fundamental right protected by the Due Process Clause.

It is incorrect to conclude on the basis of an absence of criminal penalties for an act of suicide itself and the existence of a pragmatic capacity to commit suicide that there is a constitutional right to commit suicide. Such a right is not expressly recognized in the United States Constitution or the decisions of the United States Supreme Court, and cannot reasonably be inferred. Rather, the Court repeatedly and unequivocally has affirmed the sanctity of human life and rejected the notion that there is a right of self-destruction inherent in any common-law doctrine or constitutional phrase.

The Supreme Court has the authority and the duty to change the common law where required. While the crime of murder has been classified and categorized by statute, its definition has been left to the common law. Although early decisions held that a murder conviction may be based on merely providing the means by which another commits suicide, few jurisdictions retain that view, and a majority treats assisted suicide as a separate crime, with penalties less onerous than those for

murder. Distinctions have been drawn between active participation in a suicide and involvement in the events leading up to the suicide, such as providing the means. In the years since *People v Roberts,* 211 Mich 187 (1920), was decided, interpretation of causation in criminal cases has evolved to require a closer nexus between an act and a death. Only where there is probable cause to believe that the death was the direct and natural result of the defendant's act can a defendant properly be bound over on a charge of murder. Where the defendant is involved merely in the events leading up to the commission of the final overt act, such as furnishing the means, a conviction of assisted suicide is proper. Thus, to the extent that *Roberts* can be read as support for the view that common-law murder encompasses the act of intentionally providing the means by which a person commits suicide, it should be abrogated.

Even absent a statute specifically proscribing assisted suicide, prosecution and punishment for assisting in a suicide would not be precluded, and may be had as a separate common-law offense under the saving clause of MCL 750.505; MSA 28.773. This reinterpretation of the common law does not enlarge the scope of criminal liability for assisted suicide, but rather reduces liability where a defendant merely is involved in the events leading up to the suicide, such as providing the means.

Because in the Oakland County murder case neither the circuit court nor the Court of Appeals had the benefit of this analysis for evaluating the degree of participation by the defendant, it should be remanded to the circuit court for reconsideration of the defendant's motion to quash.

Justice BOYLE, joined by Justice RILEY, concurring in part and dissenting in part, stated that the majority erroneously defines criminal homicide in the suicide context to absolve those who participate in the suicide of culpability for murder, unless they participate in the final act precipitating death. A person who participates in the death of another may be charged with murder, irrespective of the consent of the deceased.

The Supreme Court may not create a new crime of assisted suicide under the authority of the saving clause of MCL 750.505; MSA 28.773. The clause recognizes common-law crimes not proscribed by statute. The Supreme Court cannot simply exclude from the definition of common-law murder murder as defined by statute and then use the saving clause to authorize what was common-law murder as the new crime of assisted suicide.

In these cases, the acts shown establish causation as a matter

of law for purposes of bindover. Thus, the trial courts erred in quashing the informations.

Justice LEVIN, joined by Justice MALLETT, concurring in part and dissenting in part, stated that 1993 PA 3, § 7 violates the Due Process Clause insofar as it bars a competent, terminally ill person facing imminent, agonizing death from obtaining medical assistance to commit suicide. In the Oakland County murder case, the defendant's actions were not murder. The evidence establishes no more than criminal assistance of suicide or a common-law assisted suicide offense for which no provision is made by statute.

A competent person who is terminally ill may have a liberty interest in obtaining a physician's assistance to commit suicide. As applied to a particular terminally ill person, MCL 752.1028; MSA 28.547(127) may be violative of the Due Process Clause of the Fourteenth Amendment. Thus, a terminally ill person should be permitted to apply to the circuit court for an order declaring determination of entitlement to seek medical assistance to commit suicide and whether the statute is violative of the Due Process Clause as applied to that person.

The real issue is not whether the state can generally prohibit suicide; it is whether the state may deny a competent, terminally ill person, facing imminent, agonizing death, medical assistance to commit suicide.

Assisted suicide can be distinguished from other conduct protected by the Due Process Clause, such as abortion and the withdrawal of life-sustaining medical treatment. State law restrictions on a person's ability to end life implicate the interest in personal liberty. Whether a competent, terminally ill person has a right to medical assistance to commit suicide cannot be decided without balancing the state's interest against the person's interest.

In the suicide context, legitimate state interests generally outweigh the interest in ending one's life. The vast majority of suicides are irrational efforts by the depressed or mentally disturbed. Society can reasonably assume that such mental problems have clouded the person's perception. Where an otherwise healthy person is depressed or mentally disturbed, the personal liberty interest is weak, and the state has a strong interest in protecting that person's interests in life. In contrast, where the person involved is competent, terminally ill, and facing imminent, agonizing death, the interest of the state in preserving life is weak, and the interest of the terminally ill person in ending suffering is strong.

The state asserts two interests. First, the state's general interest in preserving life. In most situations where a person

might seek to commit suicide, the person, even if handicapped or emotionally disturbed, has years of life remaining for the state to protect. That possibility has been largely foreclosed for a terminally ill person. The choice that remains is not between life and death, but over the terms of death. The principal argument against assisted suicide is the second interest asserted by the state: assuring that persons who desire to live are not coerced into committing suicide. While this is clearly a concern of great importance, adequate procedures can and have been developed to assure that a terminally ill person's choice to end life is not coerced.

Justice MALLETT, joined by Justice LEVIN, concurring in part and dissenting in part, stated that a terminally ill person has a right to choose to hasten an inevitable death only where that person has made a competent decision and is suffering from great pain. The state may require proof of such a decision by clear and convincing evidence. Because the assisted suicide statute completely prohibits physician-assisted suicide, · it is facially invalid.

The liberty to end one's suffering during a terminal illness exists without the approval of a significant constituency and is no less deserving of recognition than abortion. Historical analysis of fundamental rights is inappropriate. Earlier laws or traditions are not the sources of liberty or privacy interests; constitutional provisions are limitations on the power of the sovereign to infringe the liberty of citizens. Case law has recognized that a competent person has a fundamental right to refuse unwanted medical treatment, to determine whether to continue suffering when faced with inevitable death, and that the state may not compel unwanted lifesaving treatment. To recognize a right to physician-assisted suicide is simply a logical extension of the law.

Some decisions remain so personal that society is in no position to judge their appropriateness. A person's conscience, coupled with the advice of an informed and personally chosen physician, is the appropriate decision-making method. A complete ban on physician-assisted suicide is an undue burden on the right of a terminally ill person to end suffering through physician-prescribed medication. The right of a person to hasten an inevitable death is not absolute, however. Only where the person has made a competent decision and is suffering from great pain should the right be recognized. Otherwise, the state may assert its interest in preserving life as well as other established interests.

Docket No. 99591, reversed and remanded.
Docket No. 99759, reversed and remanded.

Docket Nos. 99752, 99758, affirmed in part and reversed in part.

Docket No. 99674, vacated and remanded.

205 Mich App 180; 517 NW2d 293 (1994) vacated.

205 Mich App 194; 518 NW2d 487 (1994) affirmed in part and reversed in part.

*People v Roberts,* 211 Mich 187; 178 NW 690 (1920) overruled.

CRIMINAL LAW — ASSISTED SUICIDE — CONSTITUTIONAL LAW — TITLE-OBJECT CLAUSE.

The assisted suicide statute was validly enacted and does not violate the Title-Object Clause of the Michigan Constitution; the United States Constitution does not prohibit a state from imposing criminal penalties for assisting in a suicide (Const 1963, art 4, § 24; US Const, Am XIV; MCL 752.1027; MSA 28.547[127]).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, and Timothy A. Baughman, Chief, Research, Training and Appeals, for the people.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, and *Errol Shifman,* Assistant Prosecuting Attorney, for the people.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Joyce F. Todd,* Chief, Appellate Division, and *Richard H. Browne,* Assistant Prosecuting Attorney, for the people.

*Robert A. Sedler, Paul J. Denenfeld, Elizabeth Gleicher,* and *Eugene Feingold,* for the plaintiffs in *Hobbins.*

*Fieger, Fieger & Schwartz, P.C.* (by *Geoffrey N. Fieger, Pamela A. Hamway,* and *Michael Alan Schwartz*), for the defendant.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Deborah Anne Devine,* Assistant Attorney General In Charge, and *Thomas C. Nelson,* Assistant Attorney General, for the defendant in *Hobbins.*

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the Oakland County Prosecutor's Office.

*Steven A. Transeth* for Paul C. Hillegonds, Co-Speaker of the Michigan House of Representatives, Curtis Hertel, Co-Speaker of the Michigan House of Representatives, Dick Posthumus, Majority Leader of the Michigan Senate, and Arthur J. Miller, Jr., Minority Leader of the Michigan Senate.

*Bodman, Longley & Dahling* (by *Joseph A. Sullivan* and *Martha B. Goodloe*) for the Michigan Catholic Conference.

*Joseph P. Zanglin, Paul Benjamin Linton,* and *Clarke D. Forsythe* for Michigan State Senators and Representatives.

*James W. Kraayeveld,* Local Counsel, and *James Bopp, Jr., Thomas J. Marzen, Daniel Avila, John Altomare, and Jane E. T. Brockmann,* Co-Counsel, for the Michigan Handicapper Caucus and the Ethics and Advocacy Task Force of the Nursing Home Action Group.

*Charles Kleinbrook, P.C.* (by *Charles Kleinbrook*), and *Bopp, Coleson & Bostrom* (by *James*

*Bopp, Jr.,* and *Richard E. Coleson*) for the National Right to Life Committee, Inc.

*Curcio & Martell* (by *Elizabeth. A. Curcio* and *Marie E. Martell*) for Right to Life of Michigan.

*Butler & Modelski, P.C.* (by *Michael J. Modelski*), and *Wesley J. Smith,* for International Anti-Euthanasia Task Force.

*Honigman, Miller, Schwartz & Cohn* (by *John D. Pirich* and *Timothy Sawyer Knowlton*), *Kirk B. Johnson, David Orentlicher, Michael L. Ile,* and *Sidley & Austin* (by *Jack R. Bierig* and *Paul E. Kalb*), for American Medical Association.

*Camille Abood* and *J. Thomas Smith, Jr.,* for America 21, Family Values for the 21st Century.

MEMORANDUM OPINION. These cases raise three issues with regard to the state's imposition of criminal responsibility on persons who assist others in committing suicide. Two questions are presented by the appeals in Docket Nos. 99591, 99752, 99758, and 99759: (1) whether the Michigan assisted suicide statute, MCL 752.1027; MSA 28.547(127), was enacted in violation of Const 1963, art 4, § 24; (2) whether the criminal provisions of MCL 752.1027; MSA 28.547(127) violate the United States Constitution. In Docket No. 99674, a case predating the assisted suicide statute, the question presented is: (3) whether the circuit court erred in quashing the information charging the defendant with murder.

A majority of the justices is of the opinion that:

1) The assisted suicide provisions of the statute were validly enacted and do not violate the Title-Object Clause of the Michigan Constitution.

(CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ.)

2) The United States Constitution does not prohibit a state from imposing criminal penalties on one who assists another in committing suicide. (CAVANAGH, C.J., and BRICKLEY, BOYLE, RILEY, and GRIFFIN, JJ.)

3) In the murder case, *People v Roberts,* 211 Mich 187; 178 NW 690 (1920), is overruled to the extent that it can be read to support the view that the common-law definition of murder encompasses the act of intentionally providing the means by which a person commits suicide. Only where there is probable cause to believe that death was the direct and natural result of a defendant's act can the defendant be properly bound over on a charge of murder. Where a defendant merely is involved in the events leading up to the death, such as providing the means, the proper charge is assisting in a suicide, which may be prosecuted as a common-law felony under the saving clause, MCL 750.505; MSA 28.773, in the absence of a statute that specifically prohibits assisting in a suicide. (CAVANAGH, C.J., and LEVIN, BRICKLEY, GRIFFIN, and MALLETT, JJ.)

4) The motion to quash must be reconsidered by the circuit court to determine whether the evidence produced at the preliminary examination was sufficient to bind the defendant over for trial. (CAVANAGH, C.J., and BRICKLEY, GRIFFIN, and MALLETT, JJ.)

We reverse the judgment of the Court of Appeals in *People v Kevorkian,* Docket No. 99591, and *People v Kevorkian,* Docket No. 99759, and remand the cases to the respective circuit courts for further proceedings. In *Hobbins v Attorney General,* Docket Nos. 99752 and 99758, we reverse the judgment of the Court of Appeals with regard

to the claimed violation of Const 1963, art 4, § 24, and affirm in all other respects. Finally, in *People v Kevorkian,* Docket No. 99674, we vacate the judgment of the Court of Appeals, and remand the case to the circuit court for further proceedings.

This memorandum opinion is signed by the seven justices. There are separate concurring and dissenting opinions. However, at least four justices concur in every holding, statement, and disposition of this memorandum opinion.

CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ. These cases raise three issues with regard to the state's imposition of criminal responsibility on persons who assist others in committing suicide. Two questions are presented by the appeals in Docket Nos. 99591, 99752, 99758, and 99759: (1) Whether the Michigan assisted suicide statute, MCL 752.1027; MSA 28.547(127), was enacted in violation of Const 1963, art 4, § 24. (2) Whether the criminal provisions of MCL 752.1027; MSA 28.547(127) violate the United States Constitution. In Docket No. 99674, a case predating the assisted suicide statute, the question presented is: (3) Whether the circuit court erred in quashing the information charging the defendant with murder.

We conclude: (1) the assisted suicide provisions of the statute were validly enacted and do not violate the Title-Object Clause of the Michigan Constitution; (2) the United States Constitution does not prohibit a state from imposing criminal penalties on one who assists another in committing suicide; (3) in the murder case, the motion to quash must be reconsidered by the circuit court to determine if the evidence produced at the preliminary examination was sufficient to bind the defendant over for trial.

I

*HOBBINS v ATTORNEY GENERAL*
(DOCKET NOS. 99752, 99758)
THE "DECLARATORY JUDGMENT ACTION"

Shortly after the Legislature enacted the assisted suicide statute, a group of plaintiffs, two of whom are alleged to be suffering from terminal cancer, a friend of one of them, and seven medical care professionals, brought an action in Wayne Circuit Court, seeking a declaration that the statute was unconstitutional. The parties moved for summary judgment and the plaintiffs sought a preliminary injunction against enforcement of the statute. The circuit court found the statute to be unconstitutional.[1] First, it concluded that there were two violations of Const 1963, art 4, § 24: the statute did not have a single object, and there was a change in the purpose of the bill during its passage through the Legislature. Second, the court found a due process right to commit suicide. However, it declined to issue a preliminary injunction, concluding that hearings would be needed to determine whether the statute placed an undue burden on that right. The Attorney General filed a claim of appeal in the Court of Appeals.

*PEOPLE v KEVORKIAN*
(DOCKET NO. 99591)
THE "WAYNE COUNTY ASSISTED SUICIDE CASE"

Also after the enactment of the assisted suicide statute, defendant Kevorkian is alleged to have assisted in the death of Donald O'Keefe. The de-

---

[1] The circuit court found that the two patients, a psychiatrist, and a pharmacist had standing to challenge the statute, but that the other plaintiffs did not. The Court of Appeals did not discuss the standing question, and it has not been raised here.

fendant was charged under the statute and bound over after preliminary examination. He moved to dismiss, and the circuit court granted the motion. The court rejected the art 4, § 24 challenges to the statute, but found a due process interest in the decision to end one's life, and that the law impermissibly burdened that interest.

The court held an evidentiary hearing to determine if the facts satisfied the four-part test that it had set forth in its opinion.[2] Following the hearing, the court issued an order concluding that the facts of the case met the standard and dismissed the charge. The prosecutor appealed to the Court of Appeals.

### PEOPLE v KEVORKIAN
### (DOCKET NO. 99759)
### THE "OAKLAND COUNTY ASSISTED SUICIDE CASE"

Defendant Kevorkian was charged in two separate files with assisting in the suicides of Merion Frederick and Ali Khalili. The defendant was bound over after a preliminary examination in one case and waived examination in the other. The circuit court granted the defendant's motion to dismiss. The court discussed the potential privacy and liberty interests in ending one's life, concluding that a person does have the right to commit suicide. However, it further concluded that defen-

[2] The standard that the trial court had announced was the following:

> [T]his Court finds that when a person's quality of life is significantly impaired by a medical condition and the medical condition is extremely unlikely to improve, and that person's decision to commit suicide is a reasonable response to the condition causing the quality of life to be significantly impaired, and the decision to end one's life is freely made without undue influence, such a person has a constitutionally protected right to commit suicide.

dant Kevorkian lacked standing to challenge the statute.[3] The court also found that the statute was unconstitutional because it had more than one object and because its purpose was changed during its passage through the Legislature. The prosecuting attorney appealed.

### *PEOPLE v KEVORKIAN*
### (DOCKET NO. 99674)
### THE "OAKLAND COUNTY MURDER CASE"

Before the statute was enacted, defendant Kevorkian allegedly assisted in the deaths of Sherry Miller and Marjorie Wantz on October 23, 1991. He was indicted by a citizens' grand jury on two counts of murder.[4] After a preliminary examination, the defendant was bound over for trial.[5] In the circuit court, the defendant moved to dismiss, and the circuit judge granted the motion, concluding that assisting in suicide does not fall within the crime of murder. The prosecutor appealed.

### II

The Court of Appeals issued its decisions in two sets of opinions on May 10, 1994. One decision dealt with the cases involving the assisted suicide statute.[6] The majority concluded that the assisted suicide statute was unconstitutional because the act had more than one object, in violation of art 4, § 24. Though recognizing that it arguably was not

---

[3] The Court of Appeals did not discuss the question of standing, and it has not been raised in this Court.

[4] As permitted by statute, the indictment did not specify the degree of murder. See MCL 750.318; MSA 28.550, MCL 767.71; MSA 28.1011.

[5] The defendant also had been indicted on one count of delivering a controlled substance for other than legitimate and professionally recognized purposes. MCL 333.7401(1); MSA 14.15(7401)(1). However, the district judge dismissed the drug count.

[6] *Hobbins v Attorney General,* 205 Mich App 194; 518 NW2d 487 (1994).

necessary to deal with the remaining issue, the majority went on to consider whether the statute violated the United States Constitution. The majority concluded that there was no violation, and that the state was free to make it a criminal offense to assist another in committing suicide.[7]

The appeal regarding the murder case was decided separately.[8] The majority[9] concluded that the circuit court erred in quashing the information.

### III

The prosecuting authorities in each of the assisted suicide cases appealed the conclusion that the assisted suicide statute was enacted in violation of Const 1963, art 4, § 24. Defendant Kevorkian filed a cross appeal with regard to the United States constitutional issue in the Wayne County assisted suicide case, and the plaintiffs in the declaratory judgment action filed their own application for leave to appeal on that issue. In the murder case, defendant Kevorkian filed an application for leave to appeal. On June 6, 1994, we granted the applications, 445 Mich 920, and the cases were argued on October 4, 1994.

### IV

### A

During 1991, several bills were introduced in the

---

[7] The majority opinion was written by Judge E. Thomas Fitzgerald. The other judges on the panel, Clifford W. Taylor, and Washtenaw Circuit Judge Donald E. Shelton, sitting by assignment, wrote separate opinions. Judge Shelton concurred with regard to the art 4, § 24 issue, but dissented with regard to the United States constitutional violation. Judge Taylor concurred that the statute did not violate the United States Constitution, but would have found no art 4, § 24 violation.

[8] *People v Kevorkian No 1,* 205 Mich App 180; 517 NW2d 293 (1994).

[9] The opinion was written by Judge Fitzgerald, and concurred in by Judge Taylor. Judge Shelton dissented.

Legislature regarding the subject of assisting in suicide. The bill that ultimately became 1992 PA 270 was introduced on March 7, 1991, as HB 4501. As originally introduced, it would have created the Michigan Commission on Death and Dying that was to study "voluntary self-termination of life" and related subjects and report its recommendations to the Legislature.[10] It was referred to the Judiciary Committee, and there were public hearings in December 1991. The committee reported a substitute bill to the House on November 12, 1992.

On November 24, the House amended the substitute bill by adding a section that would make it a crime to assist another in committing suicide,[11] and the bill passed the House on that date.[12] The Senate passed the bill on December 3, 1992, and it was signed by the Governor on December 15. 1992 PA 270. It was to be effective March 31, 1993, ninety days after the legislative session, as provided by Const 1963, art 4, § 27.

---

[10] The title of the bill read:

> A bill to create the Michigan commission on death and dying; to prescribe its membership, powers, and duties; and to provide for the development of legislative recommendations concerning certain issues related to death and dying.

[11] Two other bills had been pending at the time of the introduction of HB 4501 that included criminal penalties for assisting suicide. HB 4038; SB 32. The language added to HB 4501 was very similar to that of SB 32.

[12] The title was amended to reflect the presence of the new provisions:

> A bill to create the Michigan commission on death and dying; to prescribe its membership, powers, and duties; to provide for the development of legislative recommendations concerning certain issues related to death and dying; *to prohibit certain acts pertaining to the assistance of suicide; to prescribe penalties; and to repeal certain parts of this act on a specific date.* [Emphasis added.]

On January 26, 1993, SB 211 was introduced to amend § 7 of 1992 PA 270, which contained the criminal penalties.[13] It passed the Senate on February 11. On February 25, the House approved a substitute, which, among other things, provided that the act, including both the commission and criminal provisions, would be effective on February 25, 1993. The Senate concurred in the substitute, and the Governor signed the bill that same day. 1993 PA 3.[14]

Each house had voted to give the act immediate effect, and thus the act was effective on February 25, 1993. The enrolled bill[15] sets forth

---

[13] MCL 752.1027; MSA 28.547(127). It also provided that the criminal provisions would expire six months after the commission reported to the Legislature.

[14] Under 1993 PA 3, the provision that makes it illegal to assist in a suicide reads as follows:

(1) A person who has knowledge that another person intends to commit or attempt to commit suicide and who intentionally does either of the following is guilty of criminal assistance to suicide, a felony punishable by imprisonment for not more than 4 years or by a fine of not more than $2,000.00, or both:

(a) Provides the physical means by which the other person attempts or commits suicide.

(b) Participates in a physical act by which the other person attempts or commits suicide.

(2) Subsection (1) shall not apply to withholding or withdrawing medical treatment.

(3) Subsection (1) does not apply to prescribing, dispensing, or administering medications or procedures if the intent is to relieve pain or discomfort and not to cause death, even if the medication or procedure may hasten or increase the risk of death.

(4) This section shall take effect February 25, 1993.

(5) This section is repealed effective 6 months after the date the commission makes its recommendations to the legislature pursuant to section 4. [MCL 752.1027; MSA 28.547(127).]

[15] As enacted, the title read as follows:

An act to prohibit certain acts pertaining to the assistance of suicide; to provide for the development of legislative recommendations concerning certain issues related to death and dying,

the full text of each section of the act as required by Const 1963, art 4, § 25. Pursuant to the statute, the Commission on Death and Dying was constituted and prepared its final report to the Legislature.

B

Const 1963, art 4, § 24 provides as follows:

> No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.[16]

Three kinds of challenges may be brought against statutes on the basis of Const 1963, art 4, § 24: (1) a "title-body" challenge, (2) a multiple-object challenge, and (3) a change of purpose challenge. No "title-body" challenge, claiming that the title of the act does not adequately express the content of the law, is before us. However, the other two bases for contesting the statute are presented.

The circuit court in both the declaratory judgment action and the Oakland County assisted suicide case held that the statute had more than one object and that the purpose of HB 4501 was changed during its passage through the Legislature.

The Court of Appeals majority reached only the

including assistance of suicide; to create the Michigan commission on death and dying; to prescribe its membership, powers, and duties; to prescribe penalties; and to repeal certain parts of this act on a specific date.

[16] Similar language has been in each Michigan Constitution since 1850. Const 1850, art 4, §§ 20, 25; Const 1908, art 5, §§ 21, 22.

multiple-object challenge and affirmed the circuit court decisions.[17]

We would hold that both art 4, § 24 challenges of the statute are without merit, and reverse.

1

### MULTIPLE-OBJECT CHALLENGE

The purpose of the constitutional provision now found in art 4, § 24 was stated by Justice Cooley fifteen years after such language was included in the Constitution of 1850:

> The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state. It was scarcely more so, however, than another practice, also intended to be remedied by this provision, by which, through dexterous management, clauses were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. There was no design by this clause to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, and thus multiplying their number; but the framers of the constitution meant to put an end to legislation of the vicious character referred to, which was little less than a fraud upon the public, and to require that in every case the proposed measure should stand upon its own merits, and that the legislature should be fairly notified of

---

[17] As noted above, the circuit court in the Wayne County assisted suicide case rejected the art 4, § 24 challenge.

its design when required to pass upon it. [*People ex rel Drake v Mahaney,* 13 Mich 481, 494-495 (1865).]

The provision is not meant to be applied restrictively. *Kuhn v Treasury Dep't,* 384 Mich 378, 387-388; 183 NW2d 796 (1971). See also *Local No 644 v Oakwood Hosp Corp,* 367 Mich 79, 91; 116 NW2d 314 (1962):

> Numerous cases have held that the "object" of a statute is the general purpose or aim of the enactment. The legislature may empower a body created by it to do everything requisite, necessary, or expedient to carry out the principal objective to be attained. Legislation, if it has a primary object, is not invalid because it embraces more than 1 means of attaining its primary object. *In re Brewster Street Housing Site,* 291 Mich 313 [289 NW 493 (1939)].

With all but the simplest of statutes, it would be possible to select one section, describe the "object" of that section, and be able to reason, as the Court of Appeals majority did in this case, that the remaining sections have different objects. The flaw in this approach is in defining the object of 1992 PA 270 as being limited to the content of the bill as originally introduced. The Court of Appeals said:

> The original purpose of HB 4501, as expressed in both the title and body of the bill, was to create a new public act to study certain issues related to death and dying. This bill had no regulatory authority. When HB 4501 was amended to add the substance of SB 32, the additional provisions had another and different objective—to amend the Penal Code to create the crime of criminal assistance to suicide. [205 Mich App 194, 201-202; 518 NW2d 487 (1994).]

In so reasoning, the Court of Appeals majority confused the analysis to be used in multiple-object cases with that appropriate in assessing a challenge based on a change of purpose theory. The object of the legislation must be determined by examining the law as enacted, not as originally introduced.

We would find the instant statute clearly to embrace only one object.[18] While the cases cited by the parties involving multiple-object challenges concern quite different statutes, an examination of those cases that have found multiple-object violations[19] and those that have not[20] demonstrates that

[18] The Court of Appeals majority said that although the statute encompasses a single "subject," it has two primary objectives. As noted earlier, the Court of Appeals reached that conclusion by artificially selecting as the object of the bill its content as originally introduced. Further, the terms "subject" and "object" are largely equivalent for the purpose of analyzing these issues, and are often used interchangeably by the courts, e.g., *Livonia v Dep't of Social Services,* 423 Mich 466, 499; 378 NW2d 402 (1985); *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 465-466; 208 NW2d 469 (1973). Even the Court of Appeals majority did so in the instant case:

> The purpose of the one-object provision is to avoid bringing into one bill diverse subjects that have no necessary connection. *Mooahesh [v Treasury Dep't,* 195 Mich App 551, 564; 492 NW2d 246 (1992)]. [205 Mich App 199.]

[19] For example, in *Advisory Opinion on Constitutionality of 1975 PA 227 (Question 1),* 396 Mich 123; 240 NW2d 193 (1976), the statute (1) established a political ethics commission, (2) set forth requirements for candidate committees, (3) imposed filing statements with respect to contributions and expenditures, (4) placed limits on campaign expenditures, (5) established a state campaign fund, (6) regulated lobbying activities, and (7) repealed five existing laws.

In *People v Carey,* 382 Mich 285; 170 NW2d 145 (1969), this Court held that it was improper to include in the statute dealing with the supervision, regulation, and control of motor vehicles for hire, a provision purporting to give inspectors appointed by the Public Service Commission the same powers as police officers.

In *Hildebrand v Revco Discount Drug Centers,* 137 Mich App 1; 357 NW2d 778 (1984), the Court of Appeals found it unconstitutional to include in the Michigan Civil Rights Act a provision restricting the use of polygraph results in employment decisions.

[20] In *Builders Square v Agriculture Dep't,* 176 Mich App 494, 499;

the instant case falls squarely within the category of permissible joining of statutory provisions.

The Court of Appeals majority sought to distinguish *People v Trupiano,* 97 Mich App 416; 296 NW2d 49 (1980), on which the prosecutors relied, on the ground that the statute in question in that case (the Public Health Code)[21] involved a legislative enactment constituting a "code."[22] However,

---

440 NW2d 639 (1989), it was argued that the statute had two objects —regulation of pricing and regulation of deceptive advertising. However, the Court of Appeals rejected that contention and upheld the constitutionality of the act:

> We do not believe the item pricing and deceptive advertising act violates the title-object clause of the Michigan Constitution. The purpose of [the] title-object clause, namely notice, was satisfied. Although dissimilar, the act's two objectives, regulation of pricing and advertising, are not so diverse in nature as to be at odds with the constitution. Further, the objects are consistent with the overall purpose, consumer protection. Since the title of the act need not be an index of its provisions, it is inconsequential that the act fails to mention consumer protection. A fair reading of the title demonstrates its purpose.

*Jacobson v Carlson,* 302 Mich 448; 4 NW2d 721 (1942), involved an amendment of the motor vehicle statute that dealt solely with the subject of pedestrians and sidewalks. This Court found that statute not to be in violation of the Title-Object Clause.

In *Kull v State Apple Comm,* 296 Mich 262; 296 NW 250 (1941), this Court upheld an act that contained provisions ranging from promoting the consumption and sale of apples to taxing apple production, creating an apple commission, and providing penalties. While the act addressed four seemingly diverse matters, it was proper to join them because all related to the regulation of the apple industry.

[21] The Public Health Code includes criminal penalties for controlled substance violations as well as many other provisions. MCL 333.1101 *et seq.*; MSA 14.15(1101) *et seq.*

[22] The *Trupiano* Court said:

> The Supreme Court has recognized a wide degree of discretion in reviewing legislative enactments which constitute a "code." In *Advisory Opinion re Constitutionality of 1972 PA 294, supra,* the Court noted at 463:
> "Emphasis is given to the fact that the subject matter constitutes a code and that inherently the scope of a code must be broad enough to encompass the various facets necessary to the

there is no "code exception" in art 4, § 24. Rather, the cases upholding codes against multiple-object challenges are at most an extension of the liberality with which such challenges are reviewed.

The Court of Appeals majority suggested that the Legislature could have included the provisions regarding the commission and the criminal penalties in the same bill if it had used a more general title:

> Had the Legislature intended to codify or regulate the general "subject" of assisted suicide, it could have notified the public of this intention by declaring a single broad purpose and by joining the object contained in HB 4501 with the object contained in SB 32 together in one bill. This the Legislature did not do. This failure resulted in the body of the act containing two distinct objects. The fact that the title was amended to reflect the addition of § 7 does not cure the constitutional infirmity. The one-object provision may not be circumvented by creating a title that includes different legislative objects. *Hildebrand v Revco Discount Drug Centers,* 137 Mich App 1, 11; 357 NW2d 778 (1984). [205 Mich App 202-203.]

This emphasis on the title is misplaced. It cannot be said that a statute has two objects if its title specifically describes its content, but only one if the title is general. Insofar as one of the purposes of the Title-Object Clause is to provide notice of the content of a bill to the Legislature and the public, a more specific title better achieves that purpose, particularly regarding a fairly short bill like the one in this case. Elsewhere in its opinion,

drafting of a unified law. If we fail to permit such a design codes may not be enacted in Michigan so long as the 'one-object' limitation is present in the constitution." [*Trupiano* at 420.]

the Court of Appeals majority itself recognized
that one looks to the body of the act, not the title,
to determine whether it has a single object:

> While the object must be expressed in the title,
> the body of the law must be examined to deter-
> mine whether it embraces more than one object.
> *Kent Co ex rel Bd of Supervisors of Kent Co v
> Reed,* 243 Mich 120, 122; 219 NW 656 (1928). [205
> Mich App 199.]

The *Hobbins* plaintiffs and defendant Kevorkian
also argue that there was a multiple-object viola-
tion because the provisions could have been en-
acted in separate bills. They rely on *Advisory
Opinion on Constitutionality of 1975 PA 227
(Question 1),* 396 Mich 123, 129; 240 NW2d 193
(1976):

> "The provisions in these two sections might have
> been enacted in separate laws without either of
> them in any way referring to or affecting the
> other." [Quoting *Kent Co ex rel Bd of Supervisors
> v Reed, supra* at 122.]

This principle is unsound. There is virtually no
statute that could not be subdivided and enacted
as several bills. It is precisely that kind of "multi-
plying" of legislation that we seek to avoid with
the liberal construction given to art 4, § 24.[23]

Accordingly, we would hold that the assisted
suicide statute embraces only one object and thus
was validly enacted.

---

[23] In fact, the instant statute might well be upheld even if that
principle were valid. The criminal penalties section provides that it
"is repealed effective 6 months after the date the commission makes
its recommendations to the legislature pursuant to section 4." Thus, it
could not have been separately enacted without reference to the
commission provisions.

2

## CHANGE IN PURPOSE CHALLENGE[24]

The *Hobbins* plaintiffs also challenge the statute on the ground that its purpose was changed during its passage through the Legislature. They point to *Anderson v Oakland Co Clerk*, 419 Mich 313, 329; 353 NW2d 448 (1984), as establishing that the objectives of that provision are to "preclude last-minute, hasty legislation and to provide notice to the public of legislation under consideration . . . ." The provision is integrally related to the "five-day rule" of art 4, § 26, which states that no bill can be passed until it has been printed or reproduced and in the possession of each house for at least five days. They maintain that those principles have been violated in this statute. After the bill was introduced, the Legislature amended HB 4501 to add a provision criminalizing assisted suicide. The *Hobbins* plaintiffs say that this amendment dramatically changed the purpose of the original bill, which was to create a study commission. Thus, it is argued, the Legislature was able to enact a law making assisted suicide a criminal offense without giving the people an opportunity to be heard on this highly charged and emotional issue. Looking at the legislative calendar for the day on which the amendment was made, the *Hobbins* plaintiffs find reference only to an act to create the Commission on Death and Dying.

In response to the prosecuting authorities' argument that the later enactment of 1993 PA 3 cured the defect, the plaintiffs maintain that the argument is "structurally unsound" and misstates the

[24] As noted earlier, although the Court of Appeals majority did not address this issue, the circuit court in both the Oakland County assisted suicide case and the declaratory judgment action found a change of purpose challenge to be meritorious.

effect of the reenactment of an amended law. They contend that the constitutional violation was complete when 1992 PA 270 was enacted, and that 1993 PA 3 merely amended the former act in minor respects and gave it immediate effect.

The argument by the plaintiffs fails to take into account that the criminal penalties for assistance to suicide were an interim measure tied to the Legislature's continuing consideration of issues related to death and dying, including those to be covered in the report of the commission. Thus, the penalties can be viewed as simply providing a stable environment while the Commission on Death and Dying, the Legislature, and the citizenry studied these questions further.

Moreover, cases interpreting the change of purpose clause indicate that the test for determining if an amendment or substitute changes a purpose of the bill is whether the subject matter of the amendment or substitute is germane to the original purpose.[25] The test of germaneness is much like the standard for determining whether a bill is limited to a single object. As we held above, the creation of the commission and the provision of criminal penalties were appropriately placed in the same bill.

We also agree with the prosecuting authorities that any problems with the enactment of 1992 PA 270 were eliminated with the enactment of 1993 PA 3. The plaintiffs do not claim that the later act is independently subject to attack on a change of purpose ground. It is a basic principle of statutory construction that an amending statute replaces the former provisions. As we explained in *Lahti v*

---

[25] See, e.g., *United States Gypsum Co v Dep't of Revenue,* 363 Mich 548; 110 NW2d 698 (1961); *Commuter Tax Ass'n v Detroit,* 109 Mich App 667; 311 NW2d 449 (1981); *People v Clopton,* 117 Mich App 673; 324 NW2d 128 (1982).

*Fosterling,* 357 Mich 578, 587-588; 99 NW2d 490 (1959):

> This Court in *People v Lowell,* 250 Mich 349, 354-356 [230 NW 202] (1930), said:
> "An amendatory act has a repealing force, by the mechanics of legislation, different from that of an independent statute. Repugnancy is not the essential element of implied repeal of specifically amended sections. The rule is:
> " 'Where a section of a statute is amended, the original ceases to exist, and the section as amended supersedes it and becomes a part of the statute for all intents and purposes as if the amendments had always been there.' 25 RCL [Statutes § 159], p 907. . . .
> "Nevertheless, the old section is deemed stricken from the law, and the provisions carried over have their force from the new act, not from the former. 1 Lewis, Sutherland Statutory Construction (2d ed), § 237.
> "It is plain from the authorities in this State and elsewhere that the effect of an act amending a specific section of a former act, in the absence of a saving clause, is to strike the former section from the law, obliterate it entirely and substitute the new section in its place. This effect is not an arbitrary rule adopted by the courts. It is the natural and logical effect of an amendment 'to read as follows.' It accomplishes precisely what the words import. Any other construction would do violence to the plain language of the legislature."

1993 PA 3 amended each section of 1992 PA 270, and the entire text was reprinted and re-enacted. The enacting clause stated that those sections were "amended to read as follows . . . ."

Further, it is clear that an amending statute can remedy a constitutional defect in the original act. As noted in 1A Singer, Sutherland Statutory Construction (5th ed), § 22.04, p 182, "[s]ome courts

have indicated that an unconstitutional act is legally nonexistent and cannot be given effect by an attempt to amend it." However, as the treatise goes on to explain:

> A majority of courts seem to have rejected the theory that an unconstitutional act has no existence, at least for the purpose of amendment. The unconstitutional act physically exists in the official statutes of the state and is available for reference, and as it is only unenforceable, the purported amendment is given effect. . . .
> This escape from the legal fiction that an unconstitutional act does not exist is sound. That fiction serves only as a convenient method of stating that an unconstitutional act gives no rights or imposes no duties. . . . Amendment offers a convenient method of curing a defect in an unconstitutional act. [*Id.* at 183.]

This principle has been followed in Michigan cases,[26] and is fully applicable here. The statute under which defendant Kevorkian has been charged is MCL 752.1027; MSA 28.547(127), as amended by 1993 PA 3, which was not enacted in violation of the change of purpose clause.

Accordingly, we would hold that the assisted suicide provisions of MCL 752.1027; MSA 28.547(127) are not void by reason of violation of Const 1963, art 4, § 24.

V

A

Having found that Michigan's assisted suicide

---

[26] See, e.g., *People v De Blaay,* 137 Mich 402, 404-405; 100 NW 598 (1904), *Briggs v Campbell, Wyant & Cannon Foundry Co,* 2 Mich App 204, 218-219; 139 NW2d 336 (1966), and *Kriger v South Oakland Co Mutual Aid Pact,* 49 Mich App 7, 13-15; 211 NW2d 228 (1973) (amendment cured title-object defect), rev'd on other grounds 399 Mich 835 (1977).

statute does not violate Const 1963, art 4, § 24, we now address whether the statute runs afoul of the United States Constitution. In its opinion of May 10, 1994, the Court of Appeals rejected this argument. So do we.

The Due Process Clause of US Const, Am XIV commands the states not to "deprive any person of life, liberty, or property, without due process of law . . . ." Thus, the threshold question in this case is whether the clause encompasses a fundamental right to commit suicide and, if so, whether it includes a right to assistance.

B

Those who assert that there is such a right rely heavily on decisions of the United States Supreme Court in abortion and so-called "right to die" cases. Focusing especially on *Planned Parenthood of Southeastern Pennsylvania v Casey,* 505 US 833; 112 S Ct 2791; 120 L Ed 2d 674 (1992), and *Cruzan v Director, Missouri Dep't of Health,* 497 US 261; 110 S Ct 2841; 111 L Ed 2d 224 (1990), these advocates argue that the right to end one's own life is a fundamental liberty interest, grounded in the notion of personal autonomy and springing from common-law concepts of bodily integrity and informed consent. They further contend that an integral part of this protected interest is the right to assistance, hence the term "assisted suicide."[27]

---

[27] The *Hobbins* plaintiffs object to the term "assisted suicide." They concede that there is no right under the Due Process Clause to commit "ordinary" suicide, with or without assistance. They assert only the right of mentally competent, terminally ill persons "to make the choice to hasten inevitable death," particularly by the use of lethal quantities of physician-prescribed medications. However, the common definition of "suicide" is the intentional killing of oneself by any means, and the temporal proximity of death is irrelevant to the threshold inquiry into whether the constitution encompasses such a

We do not discern in *Cruzan* and its historic roots an indication that the federal constitution protects a right more expansive than the right to refuse to begin or to continue life-sustaining medical treatment. Neither do we find in *Casey* or in the precedent from which it evolved an intent to expand the liberty interests identified by the Court in such a manner.

C

*Cruzan* was the first case to present to the United States Supreme Court the issue whether the federal constitution grants a so-called "right to die."[28] 497 US 277. The Court was asked in *Cruzan* to decide the validity of a state statute that prohibited a Missouri couple from halting the artificial nutrition and hydration of their brain-damaged daughter, absent clear and convincing evidence of her wishes.

In upholding the Missouri statute, the majority observed that the constitutional right of a competent person to refuse unwanted medical treatment could be inferred from prior Supreme Court decisions.[29] 497 US 278. For purposes of analysis, the Court "assumed" that there also was a constitu-

right. We thus do not believe that it would be appropriate to use euphemistic language, even in the context of a challenge that purports to be limited to the plight of the terminally ill. We agree with the Attorney General that there is a risk that such phraseology will disguise the reality of the very sober questions that we must decide.

[28] The case generally regarded as the landmark decision concerning the refusal of life-sustaining medical treatment is *In re Quinlan*, 70 NJ 10; 355 A2d 647 (1976), cert den sub nom *Garger v New Jersey*, 429 US 922 (1976). In *Quinlan*, the New Jersey Supreme Court reasoned that a comatose young woman had a privacy right grounded in the federal constitution to be free from bodily invasion by further treatment (a respirator), that the right was not diminished by her mental incompetency, and that her father could refuse such treatment on her behalf.

[29] In tracing the history of cases involving the right to refuse medical treatment, the Court discussed the doctrine of informed

tional right to halt lifesaving hydration and nutri-tion. However, the Court emphasized that such a liberty interest would have to be balanced against relevant state interests. The interests advanced in *Cruzan*—the preservation of life[30] and the safe-guarding of an incompetent person's wishes against potential abuses—were found sufficient to sustain the evidentiary requirement.[31]

*Casey* was decided two years after *Cruzan*. There, the Court was asked to decide the validity of a Pennsylvania abortion statute that included an "informed consent" requirement, a waiting period, and a "spousal notification" provision. In upholding all but the notification provision,[32] the

---

consent that embraces the common-law notion of "bodily integrity," i.e., "the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." 497 US 269, quoting *Union Pacific R Co v Botsford,* 141 US 250, 251; 11 S Ct 1000; 35 L Ed 734 (1891). The *Cruzan* Court said that the logical corollary of the doctrine of informed consent is that a patient generally has a right *not* to consent, i.e., a right to refuse treatment.

By footnote, the Court observed that although many state courts had found a right to refuse medical treatment in a generalized constitutional right of privacy, the Supreme Court had not. Rather, the Court had determined that the issue more properly is analyzed in terms of a Fourteenth Amendment liberty interest. See *Cruzan,* 497 US 279, n 7, citing *Bowers v Hardwick,* 478 US 186, 194-195; 106 S Ct 2841; 92 L Ed 2d 140 (1986).

[30] The Court said that the state could "properly decline to make judgments about the 'quality' of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life . . . ." *Id.* at 282.

[31] The *Cruzan* Court said that the "clear and convincing evidence" standard was appropriate not only because of the importance of the interests at issue, but also because the standard serves as a "societal judgment" about how the risk of error should be distributed between the litigants. "The more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision." In the case of an effort to terminate life-sustaining medical treatment for an incompetent person, an erroneous decision to continue treatment simply maintains the status quo. An erroneous decision to stop such treatment, however, is not susceptible to correction. 497 US 283.

[32] With respect to the notification provision, the Court observed:

Court reaffirmed the essential tenet of *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), reh den 410 US 959 (1973), which includes recognition of a woman's right under the Due Process Clause to terminate a pregnancy in its early stages, without undue interference from the state. That right is protected by "a promise of the Constitution that there is a realm of personal liberty which the government may not enter." 120 L Ed 2d 695.

The *Casey* Court explained that *Roe* "stands at the intersection of two lines of decisions . . . ." 120 L Ed 2d 701. Although this holding of *Roe* was grounded in a liberty interest relating to intimate relationships, the family, and childbearing, *Roe* also may be seen as a rule "of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection." 120 L Ed 2d 702. The choice of doctrinal category made no difference to the result in *Casey,* the Court said. It added that *Roe* also could be classified as sui generis. *Id.* at 701-702.

Drawing from *Cruzan* and *Casey,* the *Hobbins* plaintiffs[33] and defendant Kevorkian advance several theories why this Court should find that there

> It is an inescapable biological fact that state regulation with respect to the child a woman is carrying will have a far greater impact on the mother's liberty than on the father's. The effect of state regulation on a woman's protected liberty is doubly deserving of scrutiny in such a case, as the State has touched not only upon the private sphere of the family but upon the very bodily integrity of the pregnant woman. [120 L Ed 2d 727.]

[33] The Attorney General contends that the *Hobbins* plaintiffs are presenting a facial challenge to the statute, and that their claim thus must fail if there is any set of circumstances under which the assisted suicide statute would be valid. *United States v Salerno,* 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). The plaintiffs argue that *Casey* changed the analysis for a liberty interest, and that *Salerno* is not applicable. Both positions, however, assume too much. Before a facial challenge analysis can proceed, it first must be determined

is a protected liberty interest in assisted suicide, at least with regard to the terminally ill.[34] All the theories, of course, assume a fundamental liberty interest in suicide itself.[35]

The parties contend that the right to assistance in ending one's life is an integral part of "personal autonomy."[36] They emphasize that the *Casey* Court rejected a "formula" approach to deciding which rights are protected by the Fourteenth Amendment, and also the notion that new rights cannot emerge. Instead, the Court described the characteristics that are shared by protected "liberty" interests:

> These matters [marriage, procreation, contraception, family relationships, child rearing, and education], involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are

whether there is a constitutionally protected right. In light of our decision that there is no liberty interest in committing suicide, it is unnecessary for us to determine the proper analysis.

[34] No clear definition of "terminal illness" is medically or legally possible, since only in hindsight is it known with certainty when someone is going to die. One definition that has been suggested is an illness so progressed that death is likely within twelve months. Note, *A failed statute, Geoffrey Feiger, and the phrenetic physician: Physician-assisted suicide in Michigan and a patient-oriented alternative,* 28 Val Univ L R 1415, 1434, n 121 (1994). Another definition appears in MCL 333.21417; MSA 14.15(21417), which concerns eligibility for admission to a hospice:

> An individual shall be considered to have a disease or condition with a terminal prognosis if, in the opinion of a physician, the individual's death is anticipated within 6 months after the date of admission to the hospice.

[35] An attempt to find a liberty interest in assisted suicide independent of a liberty interest in suicide itself cannot succeed. If the Due Process Clause does not encompass a fundamental right to end one's life, it cannot encompass a right to assistance in ending one's life.

[36] One commentator points out that assertion of a right of personal autonomy begs the question, " '[a]utonomy to do what?' " Tsarouhas, *The case against legal assisted suicide,* 20 Ohio N U L R 793, 803 (1994).

central to the liberty protected by the Fourteenth
Amendment. At the heart of liberty is the right to
define one's own concept of existence, of meaning,
of the universe, and of the mystery of human life.
Beliefs about these matters could not define the
attributes of personhood were they formed under
compulsion of the State. [120 L Ed 2d 698.]

The proponents of assisted suicide further argue
that the right to commit suicide is analogous to
the right to refuse unwanted medical treatment, to
discontinue life support, to use contraception, and
to choose abortion. They submit that the decision
to end one's life is the ultimate right of self-deter-
mination, and that the state cannot abridge the
right unless it can articulate a compelling inter-
est.[37]

The advocates of assisted suicide ask us to adopt
the reasoning of a recent federal decision that
invalidated the State of Washington's criminal
prohibition against assisted suicide. The court held
in *Compassion in Dying v Washington,* 850 F Supp
1454, 1461 (WD Wash, 1994),[38] that the right of a
terminally ill person to the assistance of a physi-
cian in committing suicide is analogous to the
right of abortion because both fall within the
" 'realm of personal liberty which the government
may not enter.' "[39]

---

[37] While acknowledging that the state may regulate assistance in
suicide, or even actively discourage one from committing suicide, in
order to advance its interest in preserving life, the proponents of
assisted suicide maintain that the state's legitimate interest does not
extend to prolonging suffering of the terminally ill by criminalizing
suicide assistance. We find it unnecessary to consider the proper
reach of the state's regulatory interest because we disagree with the
foundational premise that there exists a constitutionally protected
liberty interest to commit suicide.

[38] Appeal pending in the United States Court of Appeals for the
Ninth Circuit (Docket No. 94-35534).

[39] The federal court appears to have limited its ruling to situations
in which the person who wants to die performs the final act that

The federal court found that the rationale in *Casey* was "almost prescriptive" of the right to end one's life. The court held that, under *Casey,* the state cannot proscribe assisted suicide if such a ban would unduly burden the right to commit suicide, i.e., if the purpose of the ban is to place a substantial obstacle in the path of the person seeking to exercise the right.

The federal court also found that the right of a terminally ill person to commit suicide with assistance does not differ in a constitutional sense from the right recognized in *Cruzan* to refuse life-sustaining medical treatment.[40] The essential premise of the court's holding was that, in each instance, the liberty interest is "the freedom to make choices according to one's individual conscience about those matters which are essential to personal autonomy and basic human dignity." *Id.* at 1461.[41]

We disagree with the federal court that either *Cruzan* or *Casey* preordains that the Supreme Court would find that any persons, including the terminally ill, have a liberty interest in suicide that is protected by the Fourteenth Amendment. Those who assert such a right misapprehend the nature of the holdings in those cases.

actually brings about death. The case concerned the right to commit suicide "by taking a lethal dose of physician-prescribed drugs." *Id.* at 1456.

[40] The court recognized that the Supreme Court only had "assumed" such an interest in *Cruzan* for purposes of analysis, but expressed confidence that if the issue was squarely presented, such a right would be found.

[41] In this regard, we observe that a right of personal autonomy cannot exist independent of a recognition of human dignity, and that it would violate the concept of human dignity to measure the value of a person's life by that person's physical and mental condition. See *Cruzan,* 497 US 282. Further, because all persons possess a basic right to personal autonomy, regardless of their physical or mental condition, there would be no principled basis for restricting a right to commit suicide to the terminally ill. The inevitability of death adds nothing to the constitutional analysis.

D

In *Cruzan,* the Court was able to "assume" a protected liberty interest in the withdrawal of life-sustaining medical treatment because it was able to distinguish between acts that artificially sustain life and acts that artificially curtail life. Although some suggest that this is a distinction without constitutional significance—a meaningless exercise in semantic gymnastics—the *Cruzan* majority disagreed[42] and so do we.

Indeed, the notion that there is a difference between action and inaction is not unfamiliar to the law. For example, the distinction between "misfeasance" and "nonfeasance" (the distinction between active misconduct and passive inaction) is deeply rooted in the law of negligence. The reason for the distinction is said to lie in the fact that a defendant creates a new risk of harm by misfeasance, but merely fails to benefit another by nonfeasance. As Dean Prosser explains, the duty to do no wrong is a legal duty, while the duty to protect against wrong is, for the most part, a moral obligation. Prosser & Keeton, Torts (5th ed), § 56, pp 373-374.[43]

Similarly, whereas suicide involves an affirmative act to end a life, the refusal or cessation of

---

[42] Further, the *Cruzan* Court was careful not to extend its decision in that case even to other issues concerning medical treatment:

[I]n deciding "a question of such magnitude and importance . . . it is the [better] part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject." [497 US 277-278.]

[43] Professor Kamisar suggests that the distinction is based more on historical and pragmatic compromise than on logic. He reasons that what is at issue are what Dean Guido Calabresi of Yale Law School called "tragic choices," i.e., choices that confront us when fundamental beliefs clash. The goal is to find "solutions that permit us to assert that we are cleaving to both beliefs in conflict." Concerning the issue

life-sustaining medical treatment simply permits life to run its course, unencumbered by contrived intervention. Put another way, suicide frustrates the natural course by introducing an outside agent to accelerate death, whereas the refusal or withdrawal of life-sustaining medical treatment allows nature to proceed, i.e., death occurs because of the underlying condition.[44]

The distinction between the withdrawal of life-sustaining medical treatment and suicide is recognized in the *Guidelines for State Court Decision Making In Life-Sustaining Medical Treatment,* National Center for State Courts (2d ed), pp 143-145 (1992). The guidelines include the following:

> There are significant moral and legal distinctions between letting die (including the use of medications to relieve suffering during the dying process) and killing (assisted suicide/euthanasia). In letting die, the cause of death is seen as the underlying disease process or trauma. In assisted suicide/euthanasia, the cause of death is seen as the inherently lethal action itself.

We agree that persons who opt to discontinue life-sustaining medical treatment are not, in effect, committing suicide. There is a difference between choosing a natural death summoned by an uninvited illness or calamity, and deliberately seeking

of refusing to begin or to continue life-sustaining medical treatment, the conflict is between (a) respecting a patient's wishes, relieving suffering, and putting an end to seemingly futile medical treatment, and (b) affirming the supreme value of life and maintaining the salutary principle that the law protects all human life, no matter how poor the quality. The professor concludes that the distinction between assisted suicide and "letting die" is not perfectly neat and logical, then asks, "But what line is?" Kamisar, *After assisted suicide, what next?,* Texas Lawyer (June 13, 1994), pp 1-2.

[44] A close examination of the medical-treatment cases suggests that they do not establish a right to choose "nonlife" at all, but rather a right to choose life's natural progression—a progression that, without fail, includes for everyone the process of dying.

to terminate one's life by resorting to death-inducing measures unrelated to the natural process of dying. *McKay v Bergstedt,* 106 Nev 808, 820; 801 P2d 617 (1990).

In affirming a lower court decision to discontinue artificial sustenance for a profoundly retarded woman who was in a persistent vegetative state, the Supreme Judicial Court of Massachusetts similarly emphasized the "well-settled" principle that withdrawing or refusing life-sustaining medical treatment is not equivalent to attempting suicide. *Guardianship of Jane Doe,* 411 Mass 512, 521; 583 NE2d 1263 (1992), cert den sub nom *Doe v Gross,* 503 US 950 (1992). The vigorous dissents in *Doe* were not offered in support of a broader right to die, but rather in recognition of the state's paramount interest in protecting life.[45]

---

[45] One dissenting justice, for instance, accused the court of deciding "to play God." 411 Mass 525. He complained that the court had involved itself in the matter ostensibly to protect the interests of the vulnerable, but then had taken advantage of the patient's vulnerability "to fashion an argument that she is a social, medical and familial burden and that her simple, fundamental needs should no longer be met." 411 Mass 529. Two other dissenters said that the majority, in effect, had approved the notion of suicide. They wrote:

> Society's respect for the value of every human life without reference to its condition, the cornerstone of American law, is inconsistent with a State's recognition of a legal right to commit suicide, assist suicide, or engage in voluntary euthanasia (mercy killing in accordance with the wishes of the suffering person). "The life of those to whom life has become a burden— of those who are hopelessly diseased or fatally wounded—nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life's enjoyment, and anxious to continue to live." Recognition of the dignity of human life demands resistance, rather than concession, to the real or imaginary death wishes of those who are afflicted with pain, depression, a sense of personal worthlessness, or a sense of burdensomeness to others. A humane society provides support of every kind, including moral support, to those who are burdened in order that they may live . . . .
>
> Can it reasonably be doubted that legal acceptance of suicide, assisted suicide, and voluntary euthanasia presents a serious

In its first case involving the cessation of life-sustaining medical treatment, the Kentucky Supreme Court found that withdrawal of nutrition and hydration from a person in a persistent vegetative state, and with irreversible brain damage, fits the medical definition of "permit[ting] the natural process of dying." *DeGrella v Elston,* 858 SW2d 698, 707 (Ky, 1993). The court cautioned that it was not engaging in "an objective inquiry into the quality of life, but a subjective inquiry into whether the patient wishes the continuation of medical procedures to interdict 'the natural process of dying.' "

> At the point where the withdrawal of life-prolonging medical treatment becomes solely another person's decision about the patient's quality of life, the individual's "inalienable right to life," as so declared in the United States Declaration of Independence and protected by Section One (1) of our Kentucky Constitution, outweighs any consideration of the quality of the life, or the value of the life, at stake. [*Id.* at 702.]

These and other recent decisions of the highest courts of other states bolster our conclusion that *Cruzan* does not portend that the United States Supreme Court would find a fundamental liberty interest in suicide, let alone assisted suicide, that is protected by the Due Process Clause of the Fourteenth Amendment.

E

1

Neither does *Casey* provide support for the posi-

risk that acceptance of involuntary euthanasia (mercy killing not chosen by the affected individual) is soon to follow? [411 Mass 531-532. Citation omitted.]

tion that the Due Process Clause encompasses a fundamental right to commit suicide. In *Casey,* the Court was not directly concerned with the establishment of a new right, but rather with whether the Court should retreat from the right previously recognized in *Roe v Wade.* In declining to overrule *Roe,* and relying heavily on the doctrine of stare decisis, the Court emphasized that abortion cases are unique. 120 L Ed 2d 698.

Although the Court in *Casey* was not called upon to determine the merits of a newly asserted due process right, it is well settled that the Due Process Clause shelters both procedural and substantive rights. *Casey,* 120 L Ed 2d 695. The latter includes those rights that have been selectively incorporated from the Bill of Rights, and those that have been found to be "fundamental."

The state argues that in determining those fundamental rights not expressly identified in, but nonetheless protected by, the Due Process Clause, the analysis must be guided by a search for whether the asserted right is implicit in the concept of ordered liberty or deeply rooted in our nation's history and traditions. See *Palko v Connecticut,* 302 US 319, 325-326; 58 S Ct 149; 82 L Ed 288 (1937), and *Snyder v Massachusetts,* 291 US 97, 105; 54 S Ct 330; 78 L Ed 674 (1934).[46]

Those who urge this Court to find a fundamental liberty interest in suicide under the Due Process Clause challenge the traditional analysis, arguing that the United States Supreme Court articulated in *Casey* a new, broader inquiry to be employed in the adjudication of substantive due process claims. They submit that even if such a right cannot be inferred from *Casey,* it nonetheless exists as a

---

[46] See also *Michael H v Gerald D,* 491 US 110, 121-122; 109 S Ct 2333; 105 L Ed 2d 91 (1989).

rational extension of those liberty interests previously recognized under a principled application of the proper test for determining whether an asserted right is protected by the Due Process Clause.[47]

We acknowledge that the United States Supreme Court said in *Casey* that courts are to exercise reasoned judgment in assessing claims of substantive due process, and that the analysis is "not susceptible of expression as a simple rule." 120 L Ed 2d 697. However, we need not resolve the debate over whether the Court established a new test because further examination of the principles discussed in *Casey* reveals that the constitutional inquiry described in that case does not fall so far outside the "implicit in the concept of ordered liberty" and "deeply rooted in history and tradition" analysis as to lead to a different conclusion here.

Thus, in the present context, consistent with the observations of Justice Harlan[48] quoted approv-

---

[47] As suggested by various amici curiae, it is important to the analysis of substantive due process that the asserted right be framed in a precise and neutral manner. This is critical in cases involving end-of-life questions, which are particularly susceptible to emotion-laden terminology and flawed syllogisms. The approach of the United States Supreme Court in assessing whether a proposed right is "fundamental" has been to narrow the threshold inquiry by applying three principles: (1) the focus should be on the specific activity that proponents argue is protected by the constitution, taking into account all relevant facts, (2) the formulation should not be so broad as to encompass activities that are logically distinct and involve separate considerations, and (3) the formulation should reasonably accommodate all of the interests at stake. Bopp & Coleson, Webster *and the future of substantive due process,* 28 Duq L R 271, 281-291 (1990). See *Webster v Reproductive Health Services,* 492 US 490; 109 S Ct 3040; 106 L Ed 2d 410 (1989).

The question presented in this case thus is not whether a person has a constitutional right of self-determination, or a right to define personal existence, or a right to make intimate and personal choices, or a right not to suffer. Rather, the question that we must decide is whether the constitution encompasses a right to commit suicide and, if so, whether it includes a right to assistance.

[48] *Poe v Ullman,* 367 US 497, 542; 81 S Ct 1752; 6 L Ed 2d 989

ingly and expanded upon in *Casey,* 120 L Ed 2d
697-698, we must determine whether the asserted
right to commit suicide arises from a rational
evolution of tradition, or whether recognition of
such a right would be a radical departure from
historical precepts. We conclude that the princi-
ples that guide analysis of substantive due process
do not support the recognition of a right to commit
suicide.

2

Although acts of suicide are documented
throughout the recorded history of England and
this nation, we find no indication of widespread
societal approval. To the contrary, suicide was a
criminal offense, with significant stigmatizing con-
sequences.[49] As a policy matter, and for practical
reasons, suicide was not criminalized in most
states. 2 LaFave & Scott, Substantive Criminal
Law, § 7.8, pp 246-251. Lawmakers recognized the
futility of punishment and the harshness of prop-
erty forfeiture and other consequences. *Id.*

Also, it was assumed that one who committed
suicide was suffering from a mental frailty of one
sort or another, and thus lacked the necessary
mens rea to commit a crime. Marzen, O'Dowd,
Crone & Balch, *Suicide: A constitutional right?,* 24
Duq L R 1, 63, 69, 85-86, 88-89 (1985).

One who assisted a suicide was accorded no such

(1961) (Harlan, J., dissenting from dismissal on jurisdictional
grounds).

[49] At common law, suicide sometimes was referred to as "self
murder." Consequences included the forfeiture of property and an
ignominious burial. Tsarouhas, n 36 *supra* at 795, citing Glanville,
*The Sanctity of Life and the Criminal Law,* 261-262 (1957), and 4
Blackstone, *Commentaries on the Laws of England* (Oxford: Claren-
don Press, 1769), pp 189, 190.

concession, however.[50] At the time the Fourteenth Amendment was ratified, at least twenty-one of the thirty-seven existing states (including eighteen of the thirty ratifying states) proscribed assisted suicide either by statute or as a common-law offense. *Id.* at 76.

Presently, a substantial number of jurisdictions have specific statutes that criminalize assisted suicide,[51] and the Model Penal Code also provides for criminal penalties.[52] Further, nearly all states ex-

[50] There is no historical exception for physician-assisted suicide. To the contrary, such involvement traditionally has been regarded as contrary to the Hippocratic oath, which includes the following sentence: " 'To please no one will I prescribe a deadly drug, nor give advice which may cause his death.' " Steadman's Medical Dictionary (5th Unabridged Lawyers' Ed), p 650.

[51] Alaska, Alas Stat 11.41.120(a)(2); Arizona, Ariz Rev Stat Ann 13-1103(A)(3); Arkansas, Ark Code Ann 5-10-104(a)(2); California, Cal Penal Code 401; Colorado, Colo Rev Stat 18-3-104(1)(b); Connecticut, Conn Gen Stat Ann 53a-56(a)(2); Delaware, Del Code Ann, tit 11, § 645; Florida, Fla Stat Ann 782.08; Georgia, Ga Code Ann 16-5-5(b); Hawaii, Hawaii Rev Stat 707-702(1)(b); Illinois, Ill Comp Stat Ann, ch 720, § 5/12-31; Indiana, Ind Stat Ann 35-42-1-2; Kansas, Kan Stat Ann 21-3406; Kentucky, Ky Rev Stat Ann 216.302; Maine, Me Rev Stat Ann, tit 17-A, § 204; Michigan, Act of December 15, 1992, 1992 PA 270 (creating Michigan commission on death and dying and prohibiting certain acts pertaining to suicide assistance); Minnesota, Minn Stat Ann 609.215; Mississippi, Miss Code Ann 97-3-49; Missouri, Mo Ann Stat 565.023; Montana, Mont Code Ann 45-5-105; Nebraska, Neb Rev Stat 28-307; New Hampshire, NH Rev Stat Ann 630:4; New Jersey, NJ Stat Ann 2C:11-6; New Mexico, NM Stat Ann 30-2-4; New York, NY Penal Law 120.30; North Dakota, ND Cent Code 12.1-16-04; Oklahoma, Okla Stat Ann, tit 21, §§ 813 to 818; Pennsylvania, 18 Pa Cons Stat Ann 2505; Puerto Rico, PR Laws Ann, tit 33, § 4009; South Dakota, SD Cod Laws Ann 22-16-37; Tennessee, Tenn Code Ann 39-13-216; Texas, Tex Penal Code Ann 22.08; Virgin Island, VI Code, tit 14, § 2141; Washington, Wash Rev Code Ann 9A.36.060; and Wisconsin, Wis Stat Ann 940.12. The State of Oregon also has a statute that forbids assisted suicide. Or Rev Stat 163.125(1)(b). However, we note that Oregon voters passed a ballot initiative called the Death with Dignity Act on November 8, 1994. The act, which permits physicians, under certain circumstances, to prescribe lethal medication for terminally ill persons, was scheduled to take effect December 8, 1994. However, a federal district court has issued a temporary restraining order pending a hearing on the matter.

[52] The Model Penal Code of the American Law Institute prohibits assisted suicide and grants a privilege to those who use force to prevent a suicide. Sections 210.5, p 91, and 3.07(5), pp 104-105.

pressly disapprove of suicide and assisted suicide
either in statutes dealing with durable powers of
attorney in health-care situations,[53] or in "living
will" statutes.[54] In addition, all states provide for
the involuntary commitment of persons who may
harm themselves as the result of mental illness,[55]
and a number of states allow the use of nondeadly
force to thwart suicide attempts.[56]

---

[53] See, for example, MCL 700.496; MSA 27.5496, which permits the
appointment of a "patient advocate" to act on the patient's behalf if
the patient is not competent to do so. Subsection 20 of the statute
states that designation of a patient advocate "shall not be construed
to condone, allow, permit, authorize, or approve suicide or homicide."
MCL 700.496(20); MSA 27.5496(20). Other jurisdictions with similar
provisions in statutes governing durable powers of attorney in health-
care situations include the District of Columbia, DC Code Ann
21-2212; Illinois, Ill Comp Stat Ann, ch 755, § 40/50; Indiana, Ind Code
Ann 30-5-5-17(b); Iowa, Iowa Code Ann 144B.12.2; Massachusetts,
Mass Ann Laws, ch 201D, § 12; New York, NY Pub Health 2989(3);
North Dakota, ND Cent Code 23-06.5-01; and Rhode Island, RI Gen
Laws 23-4.10-9(f).

[54] Jurisdictions that have such provisions in "living will" statutes
include Alabama, Ala Code 22-8A-10; Alaska, Alas Stat 18.12.080(f);
Arizona, Ariz Rev Stat Ann 36-3210; Arkansas, Ark Code Ann 20-17-210(g);
California, Cal Health & Safety Code 7191.5(g); Colorado, Colo
Rev Stat 15-18-112(1); District of Columbia, DC Code Ann 6-2430;
Florida, Fla Stat Ann 765.309(1); Georgia, Ga Code Ann 88-4111(b);
Hawaii, Hawaii Rev Stat 327D-13; Illinois, Ill Comp Stat Ann, ch 755,
§ 35/9(f); Indiana, Ind Code Ann 16-36-4-19; Iowa, Iowa Code Ann
144A.11.6; Kansas, Kan Stat Ann 65-28, 109; Kentucky, Ky Rev Stat
Ann 311.637; Louisiana, La Rev Stat Ann 40:1299.58.10.A; Maine, Me
Rev Stat Ann, tit 18-A, § 5-711(g); Maryland, Md Health Gen Code
Ann 5-611(c); Minnesota, Minn Stat Ann 145B.14; Mississippi, Miss
Code Ann 41-41-117(2); Missouri, Mo Ann Stat 459.055(5); Montana,
Mont Code Ann 50-9-205(7); Nebraska, Neb Rev Stat 20-412(7); Ne-
vada, Nev Rev Stat Ann 449.670; New Hampshire, NH Rev Stat Ann
137-H:10(II); North Carolina, NC Gen Stat 90-320(b); North Dakota,
ND Cent Code 23-06.4-01; Ohio, Ohio Rev Code Ann, tit 21,
§ 2133.12(D); Oklahoma, Okla Stat Ann, tit 63, § 3101.12(g); Oregon,
Or Rev Stat 127.645(1); Pennsylvania, 20 Pa Cons Stat Ann 5402(b);
Rhode Island, RI Gen Laws 23-4.11-10(f); South Carolina, SC Cod Ann
44-77-130; South Dakota, SD Cod Laws Ann 34-12D-20; Texas, Tex
Health & Safety Code Ann 672.020; Utah, Utah Code Ann 75-2-1118;
Virginia, Va Code Ann 54.1-2990; Washington, Wash Rev Code Ann
70.122.100; West Virginia, W Va Code 16-30-10; and Wisconsin, Wis
Stat Ann 154.11(6).

[55] See, e.g., MCL 330.1401(a); MSA 14.800(401)(a).

[56] Alas Stat 11.81.430(a)(4); Ark Code Ann 5-10-104(a)(2); Colo Rev

It is thus incorrect to conclude, on the basis of the absence of criminal penalties for an act of suicide itself and the existence of a pragmatic capacity to commit suicide, that there is a constitutional right to commit suicide.[57] Such a right is not expressly recognized anywhere in the United States Constitution or in the decisions of the United States Supreme Court, and cannot be reasonably inferred.[58] In fact, as we observed earlier in this opinion, those courts that have found a right to refuse to begin or to continue life-sustaining medical treatment have done so only after concluding that such refusal is wholly different from an act of suicide.[59]

Indeed, the United States Supreme Court repeatedly and unequivocally has affirmed the sanctity of human life and rejected the notion that there is a right of self-destruction inherent in any common-

Stat 18-1-703(1)(d); Hawaii Rev Stat 703-308(1); Ky Rev Stat Ann 503.100(1)(a); Mo Ann Stat 563.061(5); NH Rev Stat Ann 627:6(VI); NJ Stat Ann 2C:3-7(e); NY Penal Law 35.10(4); Or Rev Stat 161.209; 18 Pa Cons Stat Ann 508(d); Wis Stat Ann 939.48(5).

[57] For reasons apparent in our analysis of the due process claims, we also reject the argument that Michigan's assisted suicide statute is invalid because it denies equal protection to terminally ill persons who want help in ending their lives, i.e., it denies them a right enjoyed by terminally ill persons who opt to forgo or discontinue life-sustaining medical treatment. As we explained, the two situations are not the same for purposes of constitutional analysis.

[58] The Supreme Court of Canada said in *Rodriguez v British Columbia,* 107 DLR4th 342, 401-404 (1993), that no western democracy expressly permits assisted suicide. To the contrary, the criminal codes of most countries include a blanket ban of such conduct, and such proscriptions have not been adjudged to be unconstitutional or contrary to fundamental human rights.

[59] The right to refuse medical treatment meets the "ordered liberty" and the "historical underpinnings" tests because it is rooted in the common-law doctrine of informed consent, which embodies the notion of bodily integrity. A person may refuse life-sustaining medical treatment because the treatment itself is a violation of bodily integrity. Suicide enjoys no such foundational support, however. When one acts to end one's life, it is the intrusion of the lethal agent that violates bodily integrity.

law doctrine or constitutional phrase. In *Cruzan,*
the majority observed:

> As a general matter, the States—indeed, all
> civilized nations—demonstrate their commitment
> to life by treating homicide as a serious crime.
> Moreover, the majority of States in this country
> have laws imposing criminal penalties on one who
> assists another to commit suicide. We do not think
> a State is required to remain neutral in the face of
> an informed and voluntary decision by a physi-
> cally able adult to starve to death. [497 US 280.]

On the basis of the foregoing analysis, we would
hold that the right to commit suicide is neither
implicit in the concept of ordered liberty nor
deeply rooted in this nation's history and tradi-
tion. It would be an impermissibly radical depar-
ture from existing tradition, and from the princi-
ples that underlie that tradition, to declare that
there is such a fundamental right protected by the
Due Process Clause.

F

We are keenly aware of the intense emotions
and competing moral philosophies that character-
ize the present debate about suicide in general,
and assisted suicide in particular. The issues do
not lend themselves to simple answers. However,
while the complexity of the matter does not permit
us to avoid the critical constitutional questions,
neither does it, under the guise of constitutional
interpretation, permit us to expand the judicial
powers of this Court, especially where the question
clearly is a policy one that is appropriately left to
the citizenry for resolution, either through its

elected representatives or through a ballot initiative under Const 1963, art 2, § 9.[60]

We would hold that the Due Process Clause of the federal constitution does not encompass a fundamental right to commit suicide, with or without assistance, and regardless of whether the would-be assistant is a physician.

### VI

### A

Finally, we turn to the issue presented in the Oakland County case involving the deaths of Sherry Miller and Marjorie Wantz. Their deaths occurred before the enactment of Michigan's ban on assisted suicide, and the question is whether defendant Kevorkian can be prosecuted for his role in the deaths.

Each woman was said to be suffering from a condition that caused her great pain or was severely disabling. Each separately had sought defendant Kevorkian's assistance in ending her life. The women and several friends and relatives met

---

[60] We are mindful of Justice Cardozo's admonition nearly half a century ago:

"The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." [The Nature of the Judicial Process, quoted in *In re President & Directors of Georgetown College, Inc,* 118 US App DC 90, 97; 331 F2d 1010 (1964) (Burger, J., concurring in dissent), cert den 377 US 978 (1964).]

the defendant at a cabin in Oakland County on October 23, 1991.

According to the testimony presented at the defendant's preliminary examination, the plan was to use his "suicide machine." The device consisted of a board to which one's arm is strapped to prevent movement, a needle to be inserted into a blood vessel and attached to IV tubing, and containers of various chemicals that are to be released through the needle into the bloodstream. Strings are tied to two of the fingers of the person who intends to die. The strings are attached to clips on the IV tubing that control the flow of the chemicals. As explained by one witness, the person raises that hand, releasing a drug called methohexital, which was described by expert witnesses as a fast-acting barbiturate that is used under controlled circumstances to administer anesthesia rapidly.[61] When the person falls asleep, the hand drops, pulling the other string, which releases another clip and allows potassium chloride to flow into the body in concentrations sufficient to cause death.

The defendant tried several times, without success, to insert the suicide-machine needle into Ms. Miller's arm and hand. He then left the cabin, returning several hours later with a cylinder of carbon monoxide gas and a mask apparatus. He attached a screw driver to the cylinder, and showed Ms. Miller how to use the tool as a lever to open the gas valve.

The defendant then turned his attention to Ms. Wantz. He was successful in inserting the suicide-machine needle into her arm. The defendant explained to Ms. Wantz how to activate the device so

[61] A large enough dose can cause the recipient to stop breathing.

as to allow the drugs to enter her bloodstream. The device was activated,[62] and Ms. Wantz died.[63]

The defendant then placed the mask apparatus on Ms. Miller. The only witness at the preliminary examination who was present at the time said that Ms. Miller opened the gas valve by pulling on the screw driver. The cause of her death was determined to be carbon-monoxide poisoning.

The defendant was indicted on two counts of open murder. He was bound over for trial following a preliminary examination. However, in circuit court, the defendant moved to quash the information and dismiss the charges, and the court granted the motion.

**B**

A divided Court of Appeals reversed. *People v*

---

[62] No one who testified at the preliminary examination actually witnessed the activation of the device. The only persons in the cabin at that time were the decedents, the defendant, and the defendant's sister, who since has died. Ms. Wantz' husband was walking away from the cabin. He testified as follows:

*Q.* You don't know who pulled the string?
*A.* I have no idea. She knew that she had to pull the string when I left.
*Q.* You don't know if she tried to pull the string and it didn't work and Kevorkian pushed her hand at all, do you?
*A.* I can say this, when I left the room she was in the process of trying to pull the string.

\* \* \*

*Q.* You don't know who pulled the string? That's what you're telling me?
*A.* I can tell you she was in the process of trying to pull the string when I left the room, but I did not see her pull the string. The only thing I can take and tell you is once I left the room, Dr. Kevorkian did—I heard Dr. Kevorkian say, "Marj, you have to hold your hand up," and that is the only thing I know.

[63] The pathologist who performed the autopsy testified that there was a lethal level of methohexital in Ms. Wantz' blood, but that because of the body's release of potassium on death, no conclusions could be drawn regarding potassium chloride.

*Kevorkian No 1,* 205 Mich App 180; 517 NW2d 293 (1994). The Court of Appeals majority relied principally on *People v Roberts,* 211 Mich 187; 178 NW 690 (1920).

In *Roberts,* the defendant's wife was suffering from advanced multiple sclerosis and in great pain. She previously had attempted suicide and, according to the defendant's statements at the plea proceeding, requested that he provide her with poison. He agreed, and placed a glass of poison within her reach. She drank the mixture and died. The defendant was charged with murder. He pleaded guilty, and the trial court determined the crime to be murder in the first degree.

The defendant appealed. He argued, among other things, that because suicide is not a crime in Michigan, and his wife thus committed no offense, he committed none in acting as an accessory before the fact. The Court rejected that argument, explaining:

> If we were living in a purely common-law atmosphere with a strictly common-law practice, and defendant were charged with being guilty as an accessory of the offense of suicide, counsel's argument would be more persuasive than it is. But defendant is not charged with that offense. He is charged with murder and the theory of the people was that he committed the crime by means of poison. He has come into court and confessed that he mixed poison with water and placed it within her reach, but at her request. The important question, therefore, arises as to whether what defendant did constitutes murder by means of poison. [211 Mich 195.]

After discussing a similar Ohio case, *Blackburn v State,* 23 Ohio St 146 (1872), the *Roberts* Court concluded:

We are of the opinion that when defendant mixed the paris green with water and placed it within reach of his wife to enable her to put an end to her suffering by putting an end to her life, he was guilty of murder by means of poison within the meaning of the statute, even though she requested him to do so. By this act he deliberately placed within her reach the means of taking her own life, which she could have obtained in no other way by reason of her helpless condition. [211 Mich 198.]

In the instant case, defendant Kevorkian had argued that the discussion of this issue in *Roberts* was dicta because the defendant in that case had pleaded guilty of murder, and thus the controlling authority was *People v Campbell,* 124 Mich App 333; 335 NW2d 27 (1983).[64] The Court of Appeals majority rejected that view and said that *Roberts* controlled the issue presented in the instant case.

C

We agree with the Court of Appeals that the

---

[64] In *Campbell,* the decedent and the defendant had been drinking heavily at the decedent's home. The decedent had been talking about suicide, and the fact that he did not have a gun. The defendant offered to sell the decedent a gun. At first, the decedent did not accept the offer. However, defendant Campbell persisted in alternately encouraging and ridiculing him. Eventually, the defendant provided the decedent with a gun and five shells. The defendant and the decedent's girl friend left, and some time later, the decedent shot himself. The defendant was charged with open murder.

Although the defendant failed to persuade the circuit court to quash the information, the Court of Appeals reversed. Among other things, the Court said that more recent Supreme Court decisions had "cast doubt" that *Roberts* remained good law. The Court also noted that the trial judge in *Roberts* had "assumed that a murder had occurred and considered only the degree of that crime." 124 Mich App 337.

The *Campbell* panel further found that the defendant did not have the required "present intention to kill." He only "hoped" that the decedent would kill himself, and "hope" is not the degree of intent required to sustain a charge of murder. *Id.* at 339.

holding in *Roberts* was not dicta.[65] While it is true
that defendant Roberts pleaded guilty of placing a
poisonous mixture at the bedside of his sick wife,
knowing that she intended to use it to commit
suicide, nothing in the opinion indicates that this
Court based its affirmance of the conviction of
first-degree murder on the fact that the conviction
stemmed from a guilty plea.

However, it is not sufficient in the instant case
to decide simply that the holding in *Roberts* was
not dicta. We must determine further whether
*Roberts* remains viable, because, as noted in *People v Stevenson,* 416 Mich 383, 390; 331 NW2d 143
(1982):

> This Court has often recognized its authority,
> and indeed its duty, to change the common law
> when change is required.[66]

The crime of murder has been classified and
categorized by the Legislature, see MCL 750.316;
MSA 28.548 and MCL 750.317; MSA 28.549, but
the definition of murder has been left to the
common law. *People v Aaron,* 409 Mich 672; 299
NW2d 304 (1980); *People v Scott,* 6 Mich 287
(1859). Unless abrogated by the constitution, the
Legislature, or this Court, the common law ap-

---

[65] "When a court of last resort intentionally takes up, discusses
and decides a question *germane* to, though not necessarily
decisive of, the controversy, such decision is not a *dictum* but is
a judicial act of the court which it will thereafter recognize as a
binding decision." *Chase v American Cartage Co, Inc,* 176 Wis
235, 238 (186 NW 598 [1922]). [*Detroit v Public Utilities Comm,*
288 Mich 267, 299-300; 286 NW 368 (1939).]

[66] Citing *People v Aaron,* 409 Mich 672, 713; 299 NW2d 304 (1980);
*Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979);
*Serafin v Serafin,* 401 Mich 629; 275 NW2d 461 (1977); *Beech Grove
Investment Co v Civil Rights Comm,* 380 Mich 405; 157 NW2d 213
(1968); *Myers v Genesee Auditor,* 375 Mich 1; 133 NW2d 190 (1965).

plies. Const 1963, art 3, § 7; *Aaron, supra* at 722-723.

Under the common-law definition, " '[m]urder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in peace of the state, with malice prepense or aforethought, either express or implied.' " *Aaron, supra* at 713, quoting *People v Potter,* 5 Mich 1 (1858). Implicit in this definition is a finding that the defendant performed an act that caused the death of another. To convict a defendant of criminal homicide, it must be proven that death occurred as a direct and natural result of the defendant's act. *People v Barnes,* 182 Mich 179, 196; 148 NW 400 (1914). See also *People v Flenon,* 42 Mich App 457, 460; 202 NW2d 471 (1972) ("a defendant's [first-degree murder] conviction should only be sustained where there is a reasonable and direct causal connection between the injury and death").

Early decisions indicate that a murder conviction may be based on merely providing the means by which another commits suicide.[67] However, few jurisdictions, if any, have retained the early common-law view that assisting in a suicide is murder. The modern statutory scheme in the majority of states treats assisted suicide as a separate crime, with penalties less onerous than those for murder. See, e.g., 1993 PA 3, which was enacted by our own Legislature.[68]

---

[67] See Marzen, *supra* at 79-81.

[68] See also n 51. In addition, the Model Penal Code incorporates this view:

(1) Causing Suicide as Criminal Homicide. A person may be convicted of criminal homicide for causing another to commit suicide only if he purposely causes such suicide by force, duress or deception.

(2) Aiding or Soliciting Suicide as an Independent Offense. A person who purposely aids or solicits another to commit suicide

Recent decisions draw a distinction between active participation in a suicide and involvement in the events leading up to the suicide, such as providing the means. Frequently, these cases arise in the context of a claim by the defendant that the prosecution should have been brought under an assisted suicide statute. The courts generally have held that a person may be prosecuted for murder if the person's acts went beyond the conduct that the assisted suicide statute was intended to cover.

For example, in *People v Cleaves,* 229 Cal App 3d 367; 280 Cal Rptr 146 (1991), the defendant was charged with first-degree murder in the strangulation death of another man. The trial court had refused a defense request to instruct the jury on the statutory offense of aiding and abetting a suicide, and the jury convicted him of second-degree murder.

In deciding whether an instruction on the statu-

is guilty of a felony of the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a misdemeanor. [Model Penal Code, § 210.5.]

In commentary to its provision detailing sanctions against suicide assistance, the drafters of the Model Penal Code discussed the rationale supporting its recommendations, as well as expressing concern over the severity of the penalty imposed in *Roberts:*

The fact that penal sanctions will prove ineffective to deter the suicide itself does not mean that the criminal law is equally powerless to influence the behavior of those who would aid or induce another to take his own life. Moreover, in principle it would seem that the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request, of the suicide victim. On the other hand, cases such as *People v Roberts,* where a husband yielded to the urging of his incurably sick wife to provide her with the means of self-destruction, sorely test the resiliency of a principle that completely fails to take account of the claim for mitigation that such a circumstance presents. [ALI, Model Penal Code, § 210.5, comment at 100.]

tory offense of aiding and abetting suicide should have been given, the appellate court accepted the defendant's detailed version of the events. The decedent in *Cleaves* was suffering from AIDS and wanted the defendant's assistance in strangling himself. With the defendant's help, the decedent trussed his body in an arched position, with his face down on a pillow. The defendant's role, when the decedent "pulled down" on the truss to effect strangulation, was to put his hand on the decedent's back to steady him. At one point, when the sash slipped from the decedent's neck, the defendant rewrapped it at the decedent's request and retied it to the decedent's hands. By straightening out his body with his feet, the decedent was in sole control of how tight the sash was around his neck. In holding that the trial judge properly refused to instruct the jury under the assisted suicide statute, the appeals court said:

> [The statute] provides: "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony." As explained by our Supreme Court, the "key to distinguishing between the crimes of murder and of assisting suicide is the active or passive role of the defendant in the suicide. If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder." [*In re Joseph G,* 34 Cal 3d 429, 436; 194 Cal Rptr 163; 667 P2d 1176; 40 ALR4th 690 (1983).] The statute providing for a crime less than murder " 'does not contemplate active participation by one in the overt act directly causing death. It contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death, the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder. But where a person actually per-

forms, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committed pursuant to an agreement with the victim . . . .' " [*People v Matlock,* 51 Cal 2d 682, 694; 336 P2d 505; 71 ALR2d 605 (1959).] [229 Cal App 3d 375.]

In *Cleaves,* viewing the evidence most favorably for the defense, the court said there were no facts to support the requested instruction on aiding and abetting an assisted suicide. Although the defendant may not have applied pressure to the ligature itself, he admitted that his act of holding the decedent to keep him from falling off the bed was designed to assist the decedent in completing an act of strangulation. "This factual scenario indisputably shows active assistance in the overt act of strangulation," the court said. *Id.* at 376.

Similarly, in *State v Sexson,* 117 NM 113; 869 P2d 301 (NM App, 1994), cert den 117 NM 215 (1994), the defendant was charged with first-degree murder in connection with the fatal shooting of his wife. He was convicted of second-degree murder following a bench trial, and argued on appeal that he should have been prosecuted under the state's assisted suicide statute.

The only fact in dispute in *Sexson* was whether it was the defendant or the decedent who actually pulled the trigger of the rifle that killed her. It was not disputed that there was a suicide agreement between the two, and that the pact was genuine. The defendant claimed simply to have held the rifle in position while the decedent pulled the trigger, and that he had failed to then kill himself because he "freaked out" when the decedent continued to breathe after being shot.

The appellate court rejected the defendant's argument that he could not be prosecuted under the more general murder statute because of the specific assisted suicide statute. In so doing, the court emphasized that the two statutes proscribed different conduct:

> The wrongful act triggering criminal liability for the offense of assisting suicide is "aiding another" in the taking of his or her own life. It is well accepted that "aiding," in the context of determining whether one is criminally liable for . their involvement in the suicide of another, is intended to mean providing the means to commit suicide, not actively performing the act which results in death. . . .
>
> There are three different views about the criminal liability of one who, whether pursuant to a suicide pact or not, solicits (by talk) or aids (as by providing the means of self-destruction) another to commit suicide. Occasionally aiding or soliciting suicide has been held to be no crime at all on the ground that suicide is not criminal. That view is most certainly unsound. At one time many jurisdictions held it to be murder, but a great many states now deal specifically with causing or aiding suicide by statute, treating it either as a form of manslaughter or as a separate crime. Such statutes typically do "not contemplate active participation by one in the overt act directly causing death," and thus their existence is not barrier to a murder conviction in such circumstances.
>
> In contrast, the wrongful act triggering criminal liability for second degree murder is "kill[ing]" or "caus[ing] the death" of another. In the context of the instant case, the second degree murder statute is aimed at preventing an individual from actively causing the death of someone contemplating suicide, whereas the assisting suicide statute is aimed at preventing an individual from providing someone contemplating suicide with the means to commit suicide. Thus, the two statutes do not condemn

the same offense. . . . [117 NM —; 869 P2d 304.
Citations omitted.]

Turning to the evidence presented in *Sexson,* the
court reiterated that the distinction accepted in
other jurisdictions between murder and aiding
suicide "generally hinges upon whether the defen-
dant actively participates in the overt act directly
causing death, or whether he merely provides the
means of committing suicide." 869 P2d 304-305.
This distinction applies even where the decedent
has given consent or requested that actual assis-
tance be provided. In *Sexson,* the defendant admit-
ted holding the rifle in a position calculated to
assure the decedent's death. The court concluded:
"That action transcends merely providing Victim a
means to kill herself and becomes active participa-
tion in the death of another." 869 P2d 305.

In the years since 1920, when *Roberts* was de-
cided, interpretation of causation in criminal cases
has evolved in Michigan to require a closer nexus
between an act and a death than was required in
*Roberts.* See, e.g., *People v Flenon, supra; People v
Scott,* 29 Mich App 549, 558; 185 NW2d 576 (1971).
The United States Supreme Court also has ad-
dressed the importance of relating culpability to
criminal liability. See *Tison v Arizona,* 481 US
137; 107 S Ct 1676; 95 L Ed 2d 127 (1987); *Mulla-
ney v Wilbur,* 421 US 684, 697-698; 95 S Ct 1881;
44 L Ed 2d 508 (1975).

In the context of participation in a suicide, the
distinction recognized in *In re Joseph G, supra* at
436, constitutes the view most consistent with the
overwhelming trend of modern authority. There,
the California Supreme Court explained that a
conviction of murder is proper if a defendant
participates in the final overt act that causes
death, such as firing a gun or pushing the plunger

on a hypodermic needle. However, where a defendant is involved merely "in the events leading up to the commission of the final overt act, such as furnishing the means . . . ," a conviction of assisted suicide is proper. *Id.*

As noted, this Court has modified the common law when it perceives a need to tailor culpability to fit the crime more precisely than is achieved through application of existing interpretations of the common law. See, e.g., *Stevenson, supra; Aaron, supra.* For the reasons given, we perceive such a need here. Accordingly, we would overrule *Roberts* to the extent that it can be read to support the view that the common-law definition of murder encompasses the act of intentionally providing the means by which a person commits suicide.[69] Only where there is probable cause to believe that death was the direct and natural result of a defendant's act can the defendant be properly bound over on a charge of murder.[70]

---

[69] Because *Roberts* involved a guilty plea, the facts were not well developed. If in fact the defendant's only act was to prepare the poison and leave it for his wife to drink, and she did so knowingly and voluntarily, we would not find that sufficient participation to constitute murder. In the suicide setting, it is not enough that the defendant merely provided the means of death to be convicted of murder, or participated in the events leading up to the act that directly caused death if the defendant did not participate in the act that did directly cause death.

[70] However, there may be circumstances where one who recklessly or negligently provides the means by which another commits suicide could be found guilty of a lesser offense, such as involuntary manslaughter. There are a number of cases in which providing a gun to a person known to the defendant to be intoxicated and despondent or agitated has constituted sufficient recklessness to support such a conviction. For example, in *People v Duffy,* 79 NY2d 611, 613; 595 NE2d 814 (1992), the defendant provided a gun to the intoxicated and despondent decedent, who had said he wanted to kill himself, and urged him to "blow his head off." The decedent proceeded to shoot himself. Duffy was indicted for two counts of manslaughter in the second degree. The first count alleged that he had intentionally caused or aided the deceased in committing suicide (NY Penal Law, § 125.15[3]), and the second alleged that he had recklessly caused the death (NY Penal Law, § 125.15[1]). After a jury trial, the defendant

Where a defendant merely is involved in the events leading up to the death, such as providing the means, the proper charge is assisting in a suicide.

However, even absent a statute that specifically proscribes assisted suicide, prosecution and punishment for assisting in a suicide would not be precluded. Rather, such conduct may be prosecuted as a separate common-law offense under the saving clause of MCL 750.505; MSA 28.773:[71]

> Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court.[72]

was acquitted of the first count, but convicted of the second. The New York Court of Appeals concluded:

> [T]he conduct with which defendant was charged clearly fell within the scope of section 125.15(1)'s proscription against recklessly causing the death of another person. As the People aptly observe, a person who, knowing that another is contemplating immediate suicide, deliberately prods that person to go forward and furnishes the means of bringing about death may certainly be said to have "consciously disregard[ed] a substantial and unjustifiable risk" that his actions would result in the death of that person . . . . [79 NY2d 614.]

See also *State v Bier,* 181 Mont 27; 591 P2d 1115 (1979); *Persampieri v Commonwealth,* 343 Mass 19; 175 NE2d 387 (1961); *State v Marti,* 290 NW2d 570 (Iowa, 1980).

[71] Suicide is, by definition, the killing of oneself. Our analysis recognizes a distinction between killing oneself and being killed by another. Because suicide is not murder and is no longer viewed as criminal, see above at p 477, assisting suicide is its own species of crime.

Our opinion would leave undisturbed the law of aiding and abetting because aiding and abetting necessarily requires the commission of an offense by a principal. See *People v Kelly,* 423 Mich 261; 378 NW2d 365 (1985).

[72] See *State v Carney,* 69 NJL 478, 480; 55 A 44 (1903) (concluding that a failed attempt at suicide was criminal under the New Jersey

Our reinterpretation of the common law does not enlarge the scope of criminal liability for assisted suicide, but rather reduces liability where a defendant merely is involved in the events leading up to the suicide, such as providing the means. Therefore, there is no violation of the prohibition on ex post facto laws. US Const, art I, § 9; Const 1963, art 1, § 10. See *Stevenson, supra* at 399-400.

### D

The decision regarding whether an examining magistrate erred in binding a defendant over for trial is one that should be made in the first instance by the trial court. In this case, the lower courts did not have the benefit of the analysis set forth in this opinion for evaluating the degree of participation by defendant Kevorkian in the events leading to the deaths of Ms. Wantz and Ms. Miller.[73] Accordingly, we remand this matter to the circuit court for reconsideration of the defendant's motion to quash in light of the principles discussed in this opinion.[74]

### VII

For the reasons given, we would reverse the

saving clause, which made all "offenses of an indictable nature at common law," not otherwise provided for, misdemeanors); *State v Willis*, 255 NC 473; 121 SE2d 854 (1961) (finding an attempt to commit suicide to be an indictable misdemeanor under North Carolina's saving clause).

[73] A lower court's ruling on a motion to quash involving factual matters is reviewed by an appellate court for an abuse of discretion, and rulings regarding issues of law are reversed if erroneous. *People v Thomas*, 438 Mich 448, 452; 475 NW2d 288 (1991).

[74] Remanding to the circuit court for reconsideration of the motion to quash will not usurp the fact-finding function of the ultimate trier of fact. Bindover decisions by magistrates, and the review of those decisions by trial courts, necessarily involve preliminary factual determinations, although the standard to be employed is one of probable cause rather than guilt beyond a reasonable doubt. MCR 6.110(E).

judgment of the Court of Appeals in Docket Nos. 99591 and 99759, and remand the cases to the respective circuit courts for further proceedings. In Docket Nos. 99752 and 99758, we would reverse the judgment of the Court of Appeals with regard to the claimed violation of Const 1963, art 4, § 24, and affirm in all other respects. Finally, in Docket No. 99674, we would vacate the judgment of the Court of Appeals, and remand the case to the circuit court for further proceedings in accordance with this opinion.

CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ., concurred.

BOYLE, J. (*concurring in part and dissenting in part*). I agree with the lead opinion that § 7 of 1993 PA 3 does not violate the Title-Object Clause of the Michigan Constitution[1] in its entirety. I also agree with the lead opinion's result and rationale finding that the act is not violative of a fundamental right protected by the Due Process Clause of the state or federal constitution. In addition, as stated in the observations of Justice Harlan[2] quoted approvingly in *Planned Parenthood of Southeastern Pennsylvania v Casey,* 505 US 833; 112 S Ct 2791; 120 L Ed 2d 674, 697-698 (1992), and the expansion on those principles that follow, the task of the judiciary is to strike a balance between the respect for the liberty of the individual and the demands of organized society. Such balance should be struck with due respect to history and rationally evolving tradition. Thus, in the present context, the process of rational evolution

[1] Const 1963, art 4, § 24.

[2] *Poe v Ullman,* 367 US 497, 542; 81 S Ct 1752; 6 L Ed 2d 989 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds).

must focus on a determination whether the question of assisted suicide can be left to the political process without intrusion on a protected liberty interest, eschewing either a radical departure from tradition or the moral code of individual judges. I agree that it can.

I do not agree with the lead opinion's redefinition of the statutory offense of murder to exclude participation in the events leading up to the death, including, without limitation, providing the means and all other acts save that of the final act precipitating death. A person who participates in the death of another may be charged with murder, irrespective of the consent of the deceased. Nor do I agree with the lead opinion's conclusion or rationale justifying a charge of assisted suicide under the saving clause.[3] The saving clause recognizes only unprovided-for common-law crimes; it does not authorize this Court to create new crimes. If assisting a suicide is a common-law crime and not murder under the common-law definition incorporated in our murder statutes, it may be penalized as another crime under the saving clause. The Court, however, cannot simply exclude from the common-law definition of murder that which is murder under our statutes and then hold that the Legislature intended in the saving clause to authorize the Court to say that that which was murder at the common law is now a new crime.

Finally, I disagree with the conclusion that one who provides the means for suicides and participates in the acts leading up to death may not be charged with murder as long as the final act is that of the decedent. In stating this conclusion, the lead opinion has parsed the definition of participation to permit involvement that is dangerously

[3] MCL 750.505; MSA 28.773.

overinclusive. Absent standards established to distinguish between those who are in fact terminally ill or suffering in agony and rationally wish to die and those who are not, there is no principled vehicle in the judicial arsenal to protect against abuse, save the jury's evaluation of a given defendant's conduct. The acts shown in the Oakland County case establish causation as a matter of law for purposes of bindover. Thus, the trial court erred in quashing the information, and the decision of the Court of Appeals should be affirmed.

I

Criminal homicide has been a statutory offense in Michigan since 1846. The crime is not defined by reference to its elements but by reference to the common law. *People v Schmitt*, 275 Mich 575, 577; 267 NW 741 (1936). There is no dispute that at the time these offenses were committed, the Legislature had shown no disposition to depart from the common-law definition of murder as including assisted suicide. The lead opinion today would alter the definition of murder by changing the causation requirement in the context of suicide to exclude from liability for criminal homicide those who intentionally participate in the events that directly cause death with the intention that death occur.

However, the intended results of the plaintiff's acts were the results actually obtained, and the acts were both the cause in fact and the proximate or foreseeable cause of the decedents' deaths. The lead opinion would thus redefine murder as it is defined in our statutes and has created a special causation standard, unknown in any other jurisdiction.

The detailed account of the preliminary exami-

nation testimony describing the assisted suicides of Ms. Miller and Ms. Wantz, *ante* at 482-484, belies the notion that the degree of participation by the defendant in these events was insufficient to permit a charge of murder even in those states that have adopted separate penalties for soliciting or assisting suicide. Testimony at the preliminary examination presented evidence that the defendant, inter alia, inserted IV needles into Ms. Wantz' arm, tied strings to her fingers so she could release chemicals into her bloodstream, and placed a mask over Ms. Miller's face so that she could breathe carbon monoxide gas. *Id.* at 483-484. The mask was secured so tightly that without intervention that fact alone would have caused death. It cannot be said, as a matter of law, that these actions did not establish probable cause to believe that the defendant committed murder.

The decedents' alleged desire in the present case that they die with the defendant's assistance does not absolve the defendant of criminal liability. *People v Potter,* 5 Mich 1, 5 (1858). The request by the decedents does not provide justification or excuse. E.g., *State v Cobb,* 229 Kan 522; 625 P2d 1133 (1981); *State v Fuller,* 203 Neb 233; 278 NW2d 756 (1979); anno: *Criminal liability for death of another as result of accused's attempt to kill self or assist another's suicide,* 40 ALR4th 702, § 5, pp 709-710. The magistrate's decision to bind over the defendant for trial should be upheld.

II

The lead opinion invites the circuit court on remand to draw a distinction between acts of participation that are merely "the events leading up to" the deaths of the decedents and "*the* final overt act that causes death" that, as a matter of law, will constitute probable cause for the charge

of murder. Such a "test" transfers the responsibility for the outcome from the shoulders of this Court to the trial court and effectively converts every criminal homicide accomplished by participation into assisting suicide.

It could be argued that this solution does no more than what the assisted suicide law does. But the assisted suicide law is still only a temporary measure, and the Legislature has never indicated that it would not follow the model of other states and continue to apply the law of criminal homicide despite the existence of statutes specifically directed to suicide.

The lead opinion's "solution" is in fact an invitation to continue participation until the level of participation assumes a level of proof for bindover suggesting that the defendant intended to kill a decedent for impure reasons. In pragmatic terms, the force of the law is to discourage conduct on the margins. What the lead opinion would do in setting new margins is permit a new range of activity and thus increase the potential for abuse of the vulnerable by the active participant.

As the Canadian Supreme Court recently and aptly observed in upholding a blanket prohibition against assisted suicide:

> The basis for this refusal is twofold it seems— first, the active participation by one individual in the death of another is intrinsically morally and legally wrong, and secondly, there is no certainty that abuses can be prevented by anything less than a complete prohibition. [*Rodriguez v British Columbia,* 107 DLR4th 342, 401 (1993).]

A

*People v Roberts,* 211 Mich 187; 178 NW 690

(1920), correctly held that the homicide statute
had incorporated the common-law definition of
assisted suicide as murder. The question presented
is whether we have the authority to modify that
definition and, granting that we have the power to
do so, whether we should. *People v Couch,* 436
Mich 414; 461 NW2d 683 (1990). The latter ques-
tion involves the issue whether the judiciary can
devise an acceptable formula advancing the auton-
omy of those who deem their lives not worthy to
be lived, without jeopardizing the lives of those
whose further existence society might deem not
worthy of protection. That the Court is unable to
do so is illustrated by today's decision that alters
the law of causation in all suicide settings, not just
those of the terminally ill or acutely suffering.

As Justice Jackson observed in a famous dissent,
a judicial decision has a force all its own. "The
principle then lies about like a loaded weapon
. . . . Every repetition imbeds that principle more
deeply in our law and thinking and expands it to
new purposes." *Korematsu v United States,* 323
US 214, 246; 65 S Ct 193; 89 L Ed 194 (1944).

The fact that an active participant in the death
of another risks jury determination that the cir-
cumstances are not so compelling as to benefit
from their mercy-dispensing power tests the situa-
tion and the actions by the only repository of
authority within the judicial reach. Whether death
has been caused for good, bad, or mixed reasons, or
whether the person is in fact presently incurable
or suffering intolerable and unmanageable pain,
and has a fixed and rational desire to die, are
issues that should be addressed by a jury or the
Legislature, not by this Court as a matter of law.

Today the Court purports to approve only a mild
deviation from the common law by moving the
line of protection the murder statute affords from

participation to pulling the trigger. But the law that condemns such killings as murder has a substantially greater deterrent effect, imposing a substantially greater responsibility on those who would violate it than the penalty for assisted suicide.

While the Court's redefinition of causation is presumably correctable, the lead opinion would reduce the deterrent potential without any assurance that the line it draws will not marginally increase the risk of death for those who would have a reason to live had society and the participant in their demise valued their continued existence.

The lead opinion recognizes that the state's interest in guarding against potential abuses does not require it to stand neutral. The state's interest in protecting the lives of those who wish to live under any circumstances also justifies the most severe sanction for those who would cause such deaths. The lead opinion nonetheless sends the message that it assesses the quality of particular human life and judges as a matter of law that it is less culpable to destroy some lives than others.[4] In a society that draws a line that dictates that it is better that many go free than that one innocent person should be convicted, something approaching the principles protecting against error that are extended to the criminally accused should be extended to the victims of those who are willing to participate in suicide and to cause death, as long as they do not pull the final trigger. Kamisar, *Some non-religious views against proposed "mercy-killing" legislation,* 42 Minn L R 969, 1041 (1958).

---

[4] The line drawn today is a far less merciful one than recognizing that there is much that could and should be done for those who are truly suffering, or who, for a variety of reasons, have come to see themselves as irrelevant in this brave new world.

The lead opinion's distrust of the jury and its dislike for the severity of the punishment imposed by the law of criminal homicide has caused it to draw a line that crosses a dangerous threshold. The risk of irreversible mistake, however "minimal," should not be borne by those no longer able to protest—it should rest on those who assume the authority and wisdom to extinguish human life.

B

To the extent that this Court reduces culpability for those who actively participate in acts that produce death, we do so at the risk of the most vulnerable members of our society—the elderly, the ill, the chronically depressed, those suffering from a panoply of stressful situations: adolescence, loss of employment, the death of a child or spouse, divorce, alcoholism, the abuse of other mind-altering substances, and the burden of social stigmatization.

The lead opinion's solution assumes the actor is a sufficient buffer between the patient and the family, that the actor knows enough about the disease to assure its terminal course and enough about the sanity of the deceased to evaluate the rationality of suicide. The lead opinion thus ignores the distinction between a voluntary act carried out if the victim is sane, and the inquiry into whether the victim's mental state is compromised by disease, depression, or medication.

C

The Model Penal Code recognizes the inherent difficulty of objective management of an assisted suicide law to separate proper from improper motivations of a participant. The code classifies pur-

posely causing, that is, engaging in conduct "but for which the result in question would not have occurred," Model Penal Code, § 210.5, comment 4, p 98, suicide by force, duress, or deception as criminal homicide. Aiding or assisting another to commit suicide is a felony at the level of manslaughter if the defendant's conduct causes, that is, was a "significantly contributing factor" to a suicide or attempted suicide. *Id.,* comment 5, p 103. The same distinctions are drawn in statutory schemes. States that have enacted assisted suicide statutes continue to permit prosecutions for criminal homicides out of recognition that underinclusive line drawing by the judiciary may, as here, permit dangerously overinclusive activity.

In fact, as the excerpts from the cases cited by the lead opinion indicate, it has not aligned itself with other states. Thus, in *People v Cleaves,* 229 Cal App 3d 367, 375; 280 Cal Rptr 146 (1991), the court found that a defendant who held the decedent's back so the decedent could strangle himself was not merely a passive participant in a suicide, stating that the murder statute applies "where a person actively assists in performing the overt act resulting in death . . . ." Likewise, *State v Sexson,* 117 NM 113; 869 P2d 301 (NM App, 1994), does not support the lead opinion's revisionist view of causation. In *Sexson,* the court found that defendant could be charged with murder on evidence that he merely held a gun in place because "[t]hat action transcends merely providing the Victim a means to kill herself and becomes active participation in the death of another." *Id.,* 869 P2d 305.

The factual setting and issue decided in *In re Joseph G,* 34 Cal 3d 429; 194 Cal Rptr 163; 667 P2d 1176; 40 ALR4th 690 (1983), are markedly dissimilar from those in the present case. Unlike defendant Kevorkian, who was not a party to any

similar agreement, but rather an aider in accomplishing the deaths of two other persons, the defendant in *Joseph G* was a participant in a mutual suicide pact, intending at the time of his actions to kill both himself and his partner.[5]

In finding that a defendant who simultaneously undertook completion of the agreed to suicides with his deceased partner by a single instrumentality could only be found guilty of assisting suicide, and not murder, the California court "decline[d] to ritualistically apply the active/passive distinction" between murder and suicide assistance employed by earlier precedent to the *unique* facts before it. *Id.* at 440.

The *Joseph G* court did analyze precedent regarding the distinction between murder and the statutory crime of assisting suicide, but did not hold, as the lead opinion suggests, that a charge of murder against a suicide assistor is unavailable unless the assistor participated in the final overt act. Instead, the court concluded that "the key to distinguishing between the crimes of murder and of assisting suicide is the active or passive role of the defendant in the suicide. If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder." *Id.* at 436. The court made no clear distinction between where such passive assistance ends and active participation begins.[6]

---

[5] In addition, the court in *Joseph G* was concerned with the interpretation of a statutory proscription against assisting suicide, rather than the propriety of charging common-law murder as is present in the instant case.

[6] We do not reach the question whether *People v Roberts, supra,* should be reconsidered insofar as it might apply to one who is absent when the means furnished is consumed by the deceased. *Roberts* is factually dissimilar from the instant cases. The question whether the acts in this case constituted a common-law crime not incorporated by

Although these distinctions are irrelevant in this context because we did not have an assisted suicide statute at the time of the deaths of Ms. Wantz and Ms. Miller, the referenced discussion establishes that, in these states, participation in the overt acts causing death is chargeable as murder. Thus, the cases cited do not support the lead opinion's conclusion that if the defendant did not participate "in *the* act that . . . directly cause[s] death," *ante* at 494, n 69 (emphasis added), he cannot be bound over on a charge of murder.[7] Sexson did not pull the trigger, he held up the gun, and Cleaves did not strangle the decedent, he assisted the decedent in completing the act. Likewise, defendant Kevorkian did not pull the trigger for Ms. Miller, but he assisted Ms. Miller in completing the act. In Ms. Wantz' case, his involvement was even more direct. Defendant inserted the needle and Ms. Wantz sedated herself. When her hand dropped involuntarily, the trigger was pulled and the needle inserted by defendant was activated carrying potassium chloride in sufficient quantities to cause death.

our criminal statutes is likewise not before us. We note, however, that the Court in *Roberts* did not find it necessary to determine if suicide was a crime (although unpunishable) in Michigan. The Court's exclusive reliance on *Blackburn v State,* 23 Ohio St 146 (1872), may have obscured the fact that, unlike the Michigan statutory scheme, the Ohio statutes did not contain a saving clause. See *State v Carney,* 69 NJL 478, 480; 55 A 44 (1903). The *Roberts* definition of murder correctly states the common law embodied in our homicide statutes.

[7] The lead opinion is willing, *ante* at 494, n 70, to recognize that one who negligently furnishes the means by which another commits suicide could be found guilty of manslaughter. Thus, one who is only criminally careless and does not participate at all may be found guilty of a fifteen-year felony, while one who is present and participates in the events leading up to the act that directly caused death with the intent to cause death can only be charged with assisted suicide, punishable by a maximum penalty of five years. Moreover, since an act of suicide is innocent, it would follow that one who attempts and fails but kills others in the process may not be charged with any offense.

III

Finally, the lead opinion finds that one who has only participated in a suicide but has not done the final act causing death may be prosecuted under the saving clause. MCL 750.505; MSA 28.773. The statute is applicable only when two conditions obtain: the conduct is not otherwise punishable by statute and the conduct was indictable at common law. However, at common law, one who does the deed, even through an innocent agent, is a principle in the first degree. Perkins & Boyce, Criminal Law (3d ed), p 737. If suicide is not criminal,[8] the lead opinion has attempted by judicial fiat to create a new crime of assisting suicide. Culpability for persons assisting in suicide at common law was based on participation as parties to the crime of suicide.[9] The saving clause furnishes no basis for the Court's creation of a new crime. The usurpation of legislative authority in the lead opinion's approach is evident if one considers the reach of its rationale. The lead opinion suggests an ability to exclude certain factual settings from the reach of the homicide statutes and then, as it were, find legislative authorization of a free-standing authority to recognize newly evolving crimes punishable under the saving clause. If such conduct were permissible, the Court could simply reorder the punishment for any felony by concluding that conduct falls outside a given statute but within the saving clause. Contrary to the lead opinion's conclusion, the saving clause is not a delegation of legislative authority to this Court to create new crimes. The Legislature intended to save only what had not otherwise been covered in 1846.

---

[8] *Ante* at 495, n 71.

[9] See, generally, *id.* at 735-751 (describing the common-law distinctions between principals and accessories), pp 756-757 (applying the distinctions in suicide cases).

CONCLUSION

The lead opinion would hold that where one "only" plans and participates in a death the actor can claim was "suicide," he may not be charged as a matter of law with criminal homicide. No jurisdiction in the history of this country has so held and for obvious reasons. We have no way of assuring that redefining the line that constitutes causation will distinguish between terminally ill or desperately suffering people and those who think they are, no way of deciding in advance that the act of suicide is that of a rational person who chose death with dignity or that of a severely depressed person who would not have chosen death had help been available. Most significantly, the lead opinion's unwillingness to allow a jury to dispense mercy by determining the degree of culpability for a result clearly intended and caused in fact by a defendant is a sea change in the fundamental value we have assigned to the preservation of human life as one of the last great faiths that unites us.

The question whether the definition of murder should be changed so as to exclude one who participates in all events leading up to the death, save for the final act, is a matter of compelling public interest, demanding a balancing of legitimate interests that this Court is institutionally unsuited to perform. Although the Legislature passed a temporary assisted suicide law that included participation, it has not indicated that it intends to redefine murder, and every jurisdiction that has adopted a specific law covering assisted suicide has permitted prosecution for murder where the participation goes "too far." No issue is more deserving of continued legislative debate and public study regarding whether, when, and how persons

can maximize personal autonomy without running
the risk of creating a societal quicksand for irreversible error.

The decision to stay our hand in this matter is
not simply a matter of adhering to the rule of
law.[10] It reflects the wisdom in recognizing that if
we choose not to intervene, we have left the pressure for change in this rapidly developing and
exceedingly complex field in the forum where it is
best addressed. To choose to intervene is to remove
the pressure to decide that assisting suicide can be
found by a jury to be murder, and to add the
Court's imprimatur to the voices of those who
argue for an expansive right to self-determination
that would decriminalize assisted suicide.

As Professor Tribe observed in the context of
constitutional principles regarding these issues:

> [T]he judiciary's silence regarding such constitutional principles probably reflects a concern that,
> once recognized, rights to die might be uncontainable and might prove susceptible to grave abuse,
> more than it suggests that courts cannot be persuaded that self-determination and personhood
> may include a right to dictate the circumstances
> under which life is to be ended. In any event,
> whatever the reason for the absence in the courts
> of expansive notions about self-determination, the
> resulting deference to legislatures may prove wise
> in light of the complex character of the rights at
> stake and the significant potential that, without
> careful statutory guidelines and gradually evolved
> procedural controls, legalizing euthanasia, rather
> than respecting people, may endanger personhood.
> [Tribe, Constitutional Law (2d ed), pp 1370-1371.]

The profound questions that must be debated

---

[10] Const 1963, art 3, § 7. "The common law and the statute law now
in force, not repugnant to this constitution, shall remain in force
until they expire by their own limitations, or are changed, amended
or repealed."

and the regulatory decisions that must be made are uniquely suited for legislative resolution. There is no principled method by which the Court can amend the common-law definition of murder, included in the statutes of this state. *People v Utter*, 217 Mich 74, 86; 185 NW 830 (1921).

> [I]t is proper, in fact the oath we took requires nothing less, to rely on the Legislature to devise, should it choose to do so, a means to avoid the harsh penalty that is imposed when assisting a suicide is treated as murder pursuant to a literal application of MCL 750.316; MSA 28.548. [*People v Kevorkian No 1*, 205 Mich App 180, 191; 517 NW2d 293 (1994).]

RILEY, J., concurred with BOYLE, J.

LEVIN, J. (*concurring in part and dissenting in part*). I agree with the lead opinion that § 7 of 1993 PA 3,[1] enacting that a person, who provides the "physical means" or "participates in a physical act" by which another person attempts or commits suicide, is guilty of criminal assistance to suicide,[2]

---

[1] MCL 752.1021 *et seq.*; MSA 28.547(121) *et seq.*

[2] (1) A person who has knowledge that another person intends to commit or attempt to commit suicide and who intentionally does either of the following is guilty of criminal assistance to suicide, a felony punishable by imprisonment for not more than 4 years or by a fine of not more than $2,000.00, or both:
(a) Provides the physical means by which the other person attempts or commits suicide.
(b) Participates in a physical act by which the other person attempts or commits suicide.
(2) Subsection (1) shall not apply to withholding or withdrawing medical treatment.
(3) Subsection (1) does not apply to prescribing, dispensing, or administering medications or procedures if the intent is to relieve pain or discomfort and not to cause death, even if the medication or procedure may hasten or increase the risk of death.
(4) This section shall take effect February 25, 1993.

does not violate the Title-Object Clause of the Michigan Constitution.[3]

I further agree with the lead opinion that the common-law offense of murder should be redefined to preclude conviction for murder on evidence that the accused was merely involved in the events leading up to the death, such as providing the means, and that in such a case the proper charge is assisted suicide under the saving clause of the Penal Code providing that it is a five-year felony to commit a common-law offense for which no provision is made by statute.[4]

I also agree that § 7 of act 3 does not violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution[5] insofar as it bars assisting suicide by a physically healthy but mentally disturbed or incompetent person.[6]

---

(5) This section is repealed effective 6 months after the date the commission makes its recommendations to the legislature pursuant to section 4. [MCL 752.1027; MSA 28.547(127).]

[3] The Michigan Constitution provides:

No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title. [Const 1963, art 4, § 24.]

[4] Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court. [MCL 750.505; MSA 28.773.]

[5] The Fourteenth Amendment provides in part:

[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .

[6] The memorandum opinion states:

I would hold, however, that § 7 of act 3 violates the Due Process Clause insofar as it bars a competent, terminally ill person ·facing imminent, agonizing death from obtaining medical assistance to commit suicide.

I would accordingly direct, in the three criminal cases (numbers 99591, 99674, and 99759), that if the circuit court determines on remand that the evidence produced at the preliminary examinations shows that the persons who committed suicide were competent, terminally ill, facing an imminent, agonizing death, the motion to quash should be granted with regard to assisted suicide as well as murder, and, if the preliminary examination records are inadequate for that purpose, the matters should be remanded by the circuit court for a further preliminary examination to determine whether the persons who committed suicide were competent, terminally ill, and facing an imminent, agonizing death.

I

1993 PA 3 does not violate the Title-Object Clause of the Michigan Constitution because

- Act 3 embraces but one object, namely, issues related to death and dying, including assistance of suicide, and

2) The United States Constitution does not prohibit a state from imposing criminal penalties on one who assists another in committing suicide. (CAVANAGH, C.J., and BRICKLEY, BOYLE, RILEY, and GRIFFIN, JJ.) [*Ante,* p 445.]

I join in that statement insofar as such penalties are imposed on one who assists a physically healthy but mentally disturbed or incompetent person to commit suicide, but do not join insofar as such penalties are imposed for providing medical assistance to commit suicide to a competent, terminally ill person facing an imminent agonizing death.

- Act 3, in contrast with 1992 PA 270, was not altered or amended on its passage through either house.

## II

Dr. Kevorkian is not a murderer. The evidence in the instant *People v Kevorkian* cases, in contrast with the record in *People v Roberts,* 211 Mich 187; 178 NW 690 (1920), which depended substantially on the possibly self-serving testimony of the defendant, who had pleaded guilty, establishes that Dr. Kevorkian did no more than provide the physical means by which the decedents took their own lives. That evidence establishes no more than criminal assistance of suicide or a common-law assisted suicide offense for which no provision is made by statute.[7]

I agree with the lead opinion that *Roberts* should be overruled insofar as it can be read as holding that a person who does no more than assist another in committing suicide has acted with the requisite malice to establish that element of the crime of murder.[8]

Because the evidence adduced in the murder prosecutions showed no more than criminal assistance to suicide or such a common-law assisted suicide offense, I see no need for a remand to determine whether Dr. Kevorkian should be bound over on a charge of murder. I join in part VI of the lead opinion to join in overruling *Roberts* to the extent that it can be read to support the view that the common-law definition of murder encompasses

[7] See n 4 and accompanying text, and the lead opinion, *ante,* pp 494-495.

[8] A person who purposely causes another to commit suicide by force, duress or deception may be prosecuted for murder. See ALI, Model Penal Code, § 210.5(1), pp 91 ff.

intentionally providing the means by which a
person commits suicide.[9]

### III

The Attorney General and the prosecutors con-
tend that in no circumstance does a person have a
liberty interest under the Due Process Clause in
obtaining medical assistance to commit suicide. Dr.
Kevorkian contends that any terminally ill person
has such a liberty interest. I do not agree with
either of those absolute positions.

I have signed the opinion of a colleague[10] that
would recognize a right in some circumstances to
physician-assisted suicide because I agree with him
that a person who is terminally ill may have a
liberty interest in obtaining a physician's assis-
tance to commit suicide, and that § 7 of act 3 may
be violative of the Due Process Clause as applied
to a particular terminally ill person.

Absent legislation providing a means, with legis-
latively prescribed safeguards, by which a termi-
nally ill person may obtain such medical assis-
tance, I would hold that a terminally ill person
may apply to the circuit court for an order declar-
ing entitlement to seek medical assistance, and
that § 7 of act 3 is violative of the Due Process
Clause as applied to that person.

The developing law[11] concerning the withholding
of medical treatment[12] would assist a circuit judge
in deciding whether it is appropriate under all the

[9] *Ante,* p 494.

[10] See opinion of MALLETT, J. (concurring in part and dissenting in
part).

[11] *Guidelines for State Court Decision Making In Life-Sustaining
Medical Treatment,* National Center for State Courts (2d ed) (1992).

[12] See subsection 2 of § 7 of act 3, n 2 *supra,* which provides that
subsection 1 of § 7 of act 3 "shall not apply to withholding or
withdrawing medical treatment."

circumstances to conclude that the person is entitled to seek medical assistance to commit suicide. Such a case should, of course, be expedited, and preliminary phases of such litigation could precede the time when the terminally ill person actually faces imminent, agonizing death.

The record in *Hobbins v Attorney General* does not establish that the persons alleging terminal illness in that litigation have now reached the threshold where it would be appropriate to conclude that they are entitled to seek medical assistance to commit suicide, nor do they claim that they have an immediate desire to do so. They should be allowed to commence an action at any time to establish a record so that if and when they approach the threshold where it is appropriate to conclude that they are entitled to medical assistance to commit suicide, the preliminary phases of such litigation will have been concluded and the circuit court can, on a proper showing, expeditiously enter an order providing the relief that they seek so that they can die, if they choose, less convulsively, less painfully, and with as much dignity as may be possible.

IV

I turn to the meritorious question, whether § 7 of act 3 violates the Due Process Clause.

The lead opinion states that "the threshold question in this case is whether the [Due Process C]lause encompasses a fundamental right to commit suicide and, if so, whether it includes a right to assistance."[13]

---

[13] *Ante,* p 464.

The lead opinion similarly states:

All the theories, of course, assume a fundamental liberty interest in suicide itself. [*Ante,* p 468.]

By framing the question in this manner, the lead opinion foreordains the answer.

There is a long history of laws prohibiting suicide. The state has the power, indeed the obligation, to protect life. But laws prohibiting suicide and assisted suicide evolved to address situations different from those here at issue. Those laws assume that persons seeking to terminate their lives are emotionally disturbed or mentally ill. This is so in the vast majority of cases.

The real issue is not whether the state can generally prohibit suicide. The real issue is whether the state may deny a competent, terminally ill person, facing imminent, agonizing death, medical assistance to commit suicide.

I agree with the lead opinion that assisted suicide can be distinguished from other conduct protected by the Due Process Clause, such as abortion and the withdrawal of life-sustaining medical treatment. The absence of controlling precedent precisely addressing the issue does not, however, end the inquiry, as the lead opinion presupposes when it states, "[w]e disagree . . . that either *Cruzan* [*v Director, Missouri Dep't of Health,* 497 US 261; 110 S Ct 2841; 111 L Ed 2d 224 (1990)] or [*Planned Parenthood of Southeastern Pennsylvania* v] *Casey* [, 505 US 833; 112 S Ct 2791; 120 L Ed 2d 674 (1992),] *preordains* that the Supreme Court would find that any persons, including the terminally ill, have a liberty interest in suicide that is

The lead opinion reasons in an accompanying footnote:

> An attempt to find a liberty interest in assisted suicide independent of a liberty interest in suicide itself cannot succeed. If the Due Process Clause does not encompass a fundamental right to end one's life, it cannot encompass a right to assistance in ending one's life. [*Ante,* p 468, n 35.]

See also second paragraph of n 47 on p 476.

protected by the Fourteenth Amendment."[14] (Emphasis added.)

If the issue were preordained, these cases would not be so troubling. The real issue facing the Court is not whether suicide or assisting suicide can be proscribed by law, but whether the Due Process Clause bars a state from depriving a competent, terminally ill person, facing imminent death, and increasing agony, from obtaining medical assistance to avoid suffering such a bitter end of life.

The lead opinion distinguishes at length the instant cases from *Cruzan* and *Casey*, and stresses the obvious: there is a long history of laws outlawing suicide.

Abortion and withdrawal of life-sustaining measures are indeed different from assisted suicide. Nevertheless, a reasoned application of the principles stated in *Casey* and *Cruzan* persuades me that state law restrictions on a person's ability to end his life implicates the interest in personal liberty. Whether a competent, terminally ill person has a right to medical assistance to commit suicide cannot be decided without balancing the state's interest against the person's interest. I conclude that the United States Supreme Court, as presently composed, if constrained to decide the question, would hold that the person's interest outweighs the state's interest when the person is competent, terminally ill and facing an imminent and agonizing death.

I thus so conclude, not from any explicit command of precedent, but by applying the approach suggested by the United States Supreme Court in *Casey*, "reasoned judgment"[15] to the imperfect analogies of *Casey* and *Cruzan*.[16]

---

[14] *Ante*, p 470.

[15] *Casey, supra*, 112 S Ct 2806, opinion of O'Connor, Kennedy, and Souter.

[16] In *Cruzan*, the Court said:

V

The lead opinion dismisses *Casey,* arguing that
it was decided on the basis of stare decisis, rather
than the merits, and that abortion is sui generis.
*Casey,* however, reaffirmed the doctrinal support
for earlier abortion rights decisions of the United
States Supreme Court, stating:

> [T]he reservations any of us may have in re-
> affirming the central holding of *Roe* [*v Wade,* 410
> US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973)] are
> *outweighed by the explication of individual liberty*
> we have given combined with the force of *stare
> decisis.*" [*Id.,* 112 S Ct 2808. Emphasis added.]

The *Casey* plurality clarified the analytic method
for deciding substantive due process issues, and
said:

> The inescapable fact is that adjudication of sub-
> stantive due process claims may call upon the
> Court in interpreting the Constitution to exercise
> that same capacity which by tradition courts al-
> ways have exercised: *reasoned judgment. Its
> boundaries are not susceptible of expression as a
> simple rule.* That does not mean we are free to
> invalidate state policy choices with which we dis-
> agree; yet neither does it permit us to shrink from
> the duties of our office. [*Id.,* 112 S Ct 2806 (opinion

---

Petitioners insist that under the general holdings of our
cases, the forced administration of life-sustaining medical treat-
ment, and even of artificially delivered food and water essential
to life, would implicate a competent person's liberty interest.
Although we think the logic of the cases discussed above would
embrace such a liberty interest, the dramatic consequences
involved in refusal of such treatment would inform the inquiry
as to whether the deprivation of that interest is constitution-
ally permissible. But for purposes of this case, we assume that
the United States Constitution would grant a competent person
a constitutionally protected right to refuse lifesaving hydration
and nutrition. [497 US 279.]

of O'Connor, Kennedy, and Souter, JJ.). Emphasis
added.]

Although the lead opinion would limit the in-
quiry solely to historical practices and precedent,
*Casey* calls on us to engage in a more thoughtful,
less formulaic approach.[17]

## VI

Another line of cases, beginning with *In re
Quinlan,* 70 NJ 10; 355 A2d 647 (1976), and, more
recently *Cruzan, supra,* addresses the question
whether life-sustaining medical treatment may be
withdrawn from an incompetent person. *Cruzan*
said that recognition of a right to refuse life-
sustaining support was implicit in the Court's ear-
lier decisions construing the Due Process Clause.
The Court on that basis assumed that "the United
States Constitution would grant a *competent* per-
son a constitutionally protected right to refuse
lifesaving hydration and nutrition." *Id.* at 279.[18]

The Court said that competing interests were

---

[17] The *Casey* plurality reaffirmed the following view of the Due
Process Clause:

"Due process has not been reduced to any formula; its
content cannot be determined by reference to any code. The
best that can be said is that through the course of this Court's
decisions it has represented the balance which our Nation,
built upon postulates of respect for the liberty of the individual,
has struck between that liberty and the demands of organized
society. . . . The balance of which I speak is the balance struck
by this country, having regard to what history teaches are the
traditions from which it developed as well as the traditions
from which it broke. That tradition is a living thing." [*Id.,* 112
S Ct 2806 (quoting *Poe v Ullman,* 367 US 497, 542; 81 S Ct
1752; 6 L Ed 2d 989 [1961] [Harlan, J., dissenting from dis-
missal on jurisdictional grounds]).]

[18] As the lead opinion observes, the United States Supreme Court
premised this right on the right to refuse medical treatment. *Ante,* p
465, n 29. This right was derived as a corollary to the common-law
notion of informed consent. *Cruzan, supra* at 269-272. In addition, this

involved, especially where, as in *Cruzan*,[19] the life of an incompetent person was involved.[20] The Court ruled in conclusion that a Missouri statute requiring that there be clear and convincing evidence of the incompetent person's intent before authorizing the withdrawal of life-sustaining treatment struck a constitutionally permissible balance between the competing interests.[21]

The lead opinion contends that withdrawal of life support can be distinguished from assisted suicide. I generally agree.

A rule allowing a person to have his respirator disconnected, but to take no other steps to end his life, condemns him to choke to death on his own sputum. Similarly, if the law bars a person who can only take nourishment through a feeding tube from taking steps in addition to ordering the tube removed to end his life, he is required to suffer death by starvation and dehydration. Barring such persons from taking other steps to end their lives would, I think, constitute an undue burden on the right implicitly recognized in *Cruzan*.[22] *Cruzan* should not be read as limiting a person to a half step when that would result in greater suffering.

The legitimate concerns about involuntary euthanasia apply with at least as much force to the withdrawal of life support where the person is incompetent, yet the United States Supreme Court in *Cruzan* held that a state statute permitting the withdrawal of life support on proof of the incompetent's wishes by clear and convincing evidence was consistent with due process.

---

right was framed in terms of a protected "liberty" interest, rather than under the right to privacy. *Id.* at 279, n 7.

[19] And in *Quinlan*.
[20] *Id.* at 280-281.
[21] *Id.* at 283.
[22] See part VII.

VII

The *Casey* plurality resolved the conflict between the state's interest in the life of the fetus and the woman's interest in bodily integrity and self-determination by drawing a line at fetal viability.[23] Before viability, the state may not place an "undue burden" on the woman's right to an abortion.[24]

In *Cruzan,* the Court struck a balance between the state's interest in life and preventing euthanasia, and the incompetent person's interest in being free of unwelcome bodily intrusions. The Court found that a "clear and convincing" evidentiary standard provided a permissible balance of the competing interests.[25]

In the suicide context, legitimate state interests generally outweigh a person's interest in ending his life. The vast majority of suicides are "irrational" efforts by the depressed or mentally disturbed. Society can reasonably assume that a person's mental problems have clouded his perception. Where an otherwise healthy person is depressed or mentally disturbed, the personal liberty interest is weak, and the state has a strong interest in protecting the person's interests in life.

In contrast, where the person involved is competent, terminally ill, and facing imminent, agonizing death, the interest of the state in preserving life is weak, and the interest of the terminally ill person in ending suffering is strong.

[23] *Id.,* 112 S Ct 2817.

[24] *Id.,* 112 S Ct 2820.

The plurality stated that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.,* 112 S Ct 2820.

[25] *Id.* at 283.

The state asserts two interests.[26] First, the state's general interest in preserving life.[27] In most situations where a person might seek to commit suicide, the person, even if handicapped or emotionally disturbed, has years of life remaining for the state to protect. That possibility has been largely foreclosed for a terminally ill person. The choice that remains is not between life and death, but over the terms of death.

The principal argument against assisted suicide is the second interest asserted by the state: assuring that persons who desire to live are not coerced into committing suicide. While this is clearly a concern of great importance, adequate procedures can and have been developed to assure that a terminally ill person's choice to end life is not coerced.[28]

Restrictions on medical assistance to commit suicide for the terminally ill should be evaluated according to the undue burden standard enunciated in *Casey*.[29] The undue burden standard permits the state to regulate the process of medically assisted suicide to assure that the person truly (a) is terminally ill, (b) is competent, (c) is suffering agonizing pain, (d) faces imminent death, (e) de-

[26] The state and amici assert other interests, such as preserving the integrity of the medical profession and protecting friends and family of the suicide from emotional harm as balancing against the liberty interest recognized here. Whether these interests weigh in favor or against permitting a terminally ill person to end his own life depends on the particular circumstances of a given case. It is by no means clear that these interests would always be in opposition to the terminally ill person's liberty interest.

[27] It has been said that it is questionable why such an interest is legitimate, "completely abstracted from the interest of the person living that life . . . ." *Cruzan, supra* at 313. (Brennan, J., dissenting). But the *Cruzan* majority decided that government "may properly decline to make judgments about the "quality" of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life . . . ." *Id.* at 282.

[28] See n 10.

[29] See *Casey,* 112 S Ct 2820.

sires to commit suicide, and (f) needs or desires help to do so.

The lead opinion contends that "[n]o clear definition of 'terminal illness' is medically or legally possible, since only in hindsight is it known with certainty when someone is going to die."[30]

There is, to be sure, difficulty in defining "terminal illness." That does not justify avoiding the issue.[31]

With appropriate regulation and safeguards, the state may account for the differences in medical opinion in determining whether a competent, terminally ill person faces an imminent agonizing death.

MALLETT, J., concurred with LEVIN, J.

MALLETT, J. (*concurring in part and dissenting in part*). Because the lead opinion would find that there is no constitutional right, in any situation, to hasten one's death through physician-prescribed medications, I dissent. I agree with part IV of the lead opinion that the assisted suicide act does not violate the Title-Object Clause of the Michigan Constitution. I also agree with part VI of the lead opinion's finding, modifying the common-law definition of murder and recognizing assisting suicide

---

[30] *Ante,* p 468, n 34.

[31] As stated in *Casey:*

Consistent with other constitutional norms, legislatures may draw lines which appear arbitrary without the necessity of offering a justification. But courts may not. We must justify the lines we draw. And there is no line other than viability which is more workable. To be sure, as we have said, there may be some medical developments that affect the precise point of viability, . . . but this is an imprecision within tolerable limits given that the medical community and all those who must apply its discoveries will continue to explore the matter. [*Id.,* 112 S Ct 2817.]

as a common-law offense, and further agree that if the required elements of assisting suicide are presented to an examining magistrate under the saving clause, MCL 750.505; MSA 28.773, the defendant shall be bound over for criminal prosecution. I recognize that under part VI, the defendant in this case may possibly be prosecuted for murder. Confronted with the record presented to this Court, I would find it hard to believe that an examining magistrate could determine that the defendant here was more than merely involved in the events leading up to the commission of the final overt act and thus chargeable or prosecutable for any crime other than assisting suicide. Central to the lead opinion's position are the statements made and the legal conclusions reached in part V. The following pages contain the reasons for my dissent.

There are strong arguments based on moral principles on both sides of this issue, and this Court should be wary of accepting arguments based solely on moral principles. As the United States Supreme Court stated in *Planned Parenthood of Southeastern Pennsylvania v Casey,* 505 US 833, —; 112 S Ct 2791, 2806; 120 L Ed 2d 674 (1992), "[o]ur obligation is to define the liberty of all, not to mandate our own moral code." Defining liberty, therefore, cannot involve a morality play by any group or by a general disapproval by the majority of this Court. The liberty to end one's suffering during a terminal illness exists as shown by the decisions in *Cruzan v Director, Missouri Dep't of Health,* 497 US 261; 110 S Ct 2841; 111 L Ed 2d 224 (1990), *In re Quinlan,* 70 NJ 10; 355 A2d 647 (1976), cert den sub nom *Garger v New Jersey,* 429 US 922 (1976), and *Compassion in Dying v Washington,* 850 F Supp 1454 (WD Wash, 1994). It exists without the approval of a significant consti-

tuency and is no less deserving of recognition, than is abortion. Furthermore, I agree with the court in *Compassion in Dying,* that, in some respects, the right to physician-assisted suicide may be easier to recognize because there is no competing life interest assertable by the state.

### I. THE FOURTEENTH AMENDMENT

The rights conferred under the substantive portion of the Due Process Clause have been developing for over one hundred years. *Mugler v Kansas,* 123 US 623; 8 S Ct 273; 31 L Ed 205 (1887). As pointed out in *Planned Parenthood v Casey,* 112 S Ct 2804, the Due Process Clause contains "a substantive component as well, one 'barring certain government actions regardless of the fairness of the procedures used to implement them,' " quoting *Daniels v Williams,* 474 US 327, 331; 106 S Ct 662; 88 L Ed 2d 662 (1986).[1]

The constitutional claim presented here falls squarely within the Due Process Clause of the Fourteenth Amendment that maintains that no state shall "deprive any person of life, liberty, or

---

[1] In *Griswold v Connecticut,* 381 US 479, 500-501; 85 S Ct 1678; 14 L Ed 2d 510 (1965), in concurrence, Justice Harlan outlined the criteria for reviewing constitutional claims brought pursuant to the Due Process Clause stating that

the proper constitutional inquiry in this case is whether [the] statute infringes the Due Process Clause of the Fourteenth Amendment because the enactment violates basic values "implicit in the concept of ordered liberty," . . . .

While the relevant inquiry may be aided by resort to one or more of the provisions of the Bill of Rights, it is not dependent on them or any of their radiations. [Citations omitted.]

\* \* \*

"Specific" provisions of the Constitution, no less than "due process," lend themselves as readily to "personal" interpretations by judges whose constitutional outlook is simply to keep the Constitution in supposed "tune with the times" . . . .

property, without due process of law . . . ." As in the abortion cases, the governing word in this case is "liberty."

The joint opinion of Justices O'Connor, Kennedy, and Souter, in reaffirming a woman's right to receive an abortion, recognized that such cases are at "an intersection of two lines of decisions . . . ." *Casey,* 112 S Ct 2810. These cases may be viewed as either "an exemplar of *Griswold* liberty" or examples of "personal autonomy and bodily integrity . . . ." *Id.,* 112 S Ct 2810, citing *Cruzan, supra* at 278.[2] Whether physician-assisted suicide is characterized as a liberty right or a privacy right, the proper constitutional analysis is found in *Casey* and the right to die cases.

The lead opinion and the various amici curiae in this case contend that liberty interests exist only where conduct is " 'deeply rooted in this Nation's history and tradition' " or " 'implicit in the concept of order liberty' . . . ." See *Bowers v Hardwick,* 478 US 186, 191-192; 106 S Ct 2841; 92 L Ed 2d 140 (1986), quoting *Palko v Connecticut,* 302 US 319, 325-326; 58 S Ct 149; 82 L Ed 288 (1937), and *Moore v East Cleveland, Ohio,* 431 US 494, 503; 97

---

[2] The right that should be recognized here is a privacy right as well as a liberty right. In *Griswold, supra,* the United States Supreme Court recognized that decisions of married couples concerning procreation are private in character. In *Thornburgh v American College of Obstetricians & Gynecologists,* 476 US 747, 777, n 5; 106 S Ct 2169; 90 L Ed 2d 779 (1986), Justice Stevens observed that "the concept of privacy embodies the 'moral fact that a person belongs to himself and not others nor to society as a whole.' "

The present case is also analogous to the family or bodily integrity cases to the extent these cases extended liberty interests to matters of public social concern. In *Washington v Harper,* 494 US 210; 110 S Ct 1028; 108 L Ed 2d 178 (1990), the Court found that an inmate has a significant liberty interest under the Due Process Clause in avoiding the unwanted administration of drugs. However, the Court found that the state's compelling interest outweighed the inmate's personal liberty interest. In *Loving v Virginia,* 388 US 1; 87 S Ct 1817; 18 L Ed 2d 1010 (1967), the Court held that couples have a liberty interest to marry outside of their own race.

S Ct 1932; 52 L Ed 2d 531 (1977). They argue that because there is a common background making suicide and assisted suicide crimes, physician-assisted suicide cannot be a fundamental right. They also argue that such a right cannot be found anywhere in the constitution or its amendments. However, to recognize only fundamental rights according to such a test is unsuitable for the vast and fast-moving progressions of the modern world. Earlier laws or traditions are not the "source" of liberty or privacy interests. If this were so, our nation's Supreme Court would have been unable to recognize the rights that many of us now understand to be inherent in our very being.[3] As Justice

---

[3] The United States Constitution does not, nor could it, specifically spell out each right a person maintains as an individual. The application of the express constitutional principles embodied in the Bill of Rights resolves only the easiest cases. Emanating from these principles, however, are implied rights and interests that are no less important to individual liberties than those specifically provided in the Bill of Rights. *Griswold v Connecticut,* n 1 *supra.* These rights lie within the parameters of the Bill of Rights, applicable to the states through the Fourteenth Amendment.

Under the First Amendment, these unarticulated rights include the freedom to associate and privacy in one's associations, *NAACP v Alabama ex rel Patterson,* 357 US 449, 462; 78 S Ct 1163; 2 L Ed 2d 1488 (1958); the right to educate a child in a school of the parent's choice, *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925); and the right to study the German language in a private school, *Meyer v Nebraska,* 262 US 390; 43 S Ct 625; 67 L Ed 1042 (1923). Tangential to the Fourth Amendment right to be free from unlawful search and seizure is a limited right to be free from the unlawful withdrawal of blood. *Schmerber v California,* 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966). Attached to the Ninth Amendment is the historical recognition that additional rights exist outside the constitution's plain wording.

> The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments. [*Griswold, supra* at 488 (Goldberg, J., concurring).]

The concept that courts may construct new liberty rights pursuant to the Fourteenth Amendment is well established. Pursuant to the

Stevens stated in *Meachum v Fano,* 427 US 215, 230; 96 S Ct 2532; 49 L Ed 2d 451 (1976):

> [N]either the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. *But it is not the source of liberty, and surely not the exclusive source.* [Emphasis added.]

Following the lead opinion's logic to its conclusion, fundamental rights would only arise if

Fourteenth Amendment, there is a fundamental right to marry a person of another race. *Loving v Virginia, supra.* Married persons have the right to receive medical advice regarding contraception. *Griswold v Connecticut, supra; Eisenstadt v Baird,* 405 US 438; 92 S Ct 1029; 31 L Ed 2d 349 (1972) (extending the right to unmarried persons); *Carey v Population Services Int'l,* 431 US 678; 97 S Ct 2010; 52 L Ed 2d 675 (1977) (recognizing the right to sell and distribute contraceptives).

Also pursuant to the Fourteenth Amendment is the line of cases protecting a person's right of personal autonomy and self-determination. Part of the right to personal autonomy is the right to refuse unwanted medical treatment, *Washington v Harper, supra,* and of course the right to receive an abortion, *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973); *Casey, supra.*

This is not an exhaustive list of the rights that lie within the penumbras of the Bill of Rights, both in terms of the cases already decided as well as those to be decided in the future. As Justice Harlan declared in dissent in *Poe v Ullman,* 367 US 497, 543; 81 S Ct 1752; 6 L Ed 2d 989 (1961), these matters fall all along the "rational continuum" of rights. It is a mistake to focus on whether physician-assisted suicide is a right textually demonstrable within the body of the constitution.

The individual liberty interest in ending one's suffering during terminal illness lies within the penumbras of the Ninth and Fourteenth Amendments. Furthermore, there is a privacy right emanating from the Fourteenth Amendment to seek guidance from a physician of choice so that an informed and knowledgeable decision can be made. As with the right to abortion, the right in the present case may be identified either as a privacy or liberty right.

backed by a significant constituency. " 'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy. . . . [F]undamental rights may not be submitted to vote; they depend on the outcome of no elections. . . .' " Tribe, Constitutional Law (2d ed), p 1351, quoting *West Virginia Bd of Ed v Barnette*, 319 US 624, 638; 63 S Ct 1178; 87 L Ed 1628 (1943). Moreover, if the historical analysis test is appropriate, then the holding in *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), would be nothing more than an exception to the rule.[4]

### A. THE RIGHT TO DIE

This Court should not demand that plaintiffs establish an historical right to self determine the quality of life that a terminally ill person must endure.

The lead opinion suggests that because the *Cruzan* Court merely "assumed" for the purposes of that case that a person has a constitutional right to refuse life-sustaining treatment such a right may not exist. Yet if this Court was squarely presented with that issue, it is doubtful that it would rule contrary to established precedent of this state and others.[5]

Even applying the "concept of ordered liberty"

---

[4] Indeed there is a great deal of historical antecedence for the proposition that abortion is a criminal offense. See *Roe* at 129-141 (tracing the criminal history of abortion).

[5] See *In re Rosebush*, 195 Mich App 675; 491 NW2d 633 (1992) (allowing the parents of a minor the right to determine whether life-sustaining treatment should be withheld or withdrawn from the minor). See also *In re Conroy*, 98 NJ 321; 486 A2d 1209 (1985); *Donaldson v Lundgren*, 2 Cal App 4th 1614, 1620; 4 Cal Rptr 2d 59 (1992); *In re Quinlan, supra; Cruzan, supra* at 270-274. See also anno: *Judicial power to order discontinuance of life-sustaining treatment*, 48 ALR4th 67.

analysis espoused by the lead opinion, the right to refuse life-sustaining treatment can be recognized. In *Washington v Harper,* 494 US 210; 110 S Ct 1028; 108 L Ed 2d 178 (1990), the United States Supreme Court found that a competent person, even an inmate who suffers from psychotic episodes, has a due process liberty interest to be free from the unwanted administration of antipsychotic medications.[6] Further, in the seminal case, *In re Quinlan, supra* at 39, the New Jersey Supreme Court explicitly recognized such a right:

> We have no doubt, in these unhappy circumstances, that if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death.
>
> *  *  *
>
> We have no hesitancy in deciding . . . that no external compelling interest of the State could compel Karen to endure the unendurable, only to vegetate a few measurable months with no realistic possibility of returning to any semblance of cognitive or sapient life.

Both *Harper* and *Quinlan,* establish that a competent person has a fundamental right to refuse unwanted medical treatment. But more importantly, *Quinlan* and its progeny establish that a person has a right to determine whether to continue suffering when faced with an inevitable death and that the state may not compel unwanted lifesaving treatment.

[6] However, the Court ultimately held that the state's interest in preserving the orderly administration of its prisons and mental institutions outweighed the inmate's right of personal autonomy. *Id.*

Moreover, other jurisdictions have recognized that the state's interest in preserving life includes the duty to protect the right of a person not to die in a demeaning or degrading manner.[7] To recognize the right asserted here is simply a logical extension of the law.[8] As Justice O'Connor stated

[7] See *Brophy v New England Sinai Hosp,* 398 Mass 417, 434; 497 NE2d 626 (1986). "The duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity." See also *Cruzan* at 310-311.

This state also protects the rights of the terminally ill to refuse life-sustaining treatment as evidenced by the statutory allowance of a patient advocate to make a decision to withhold or withdraw treatment.

> A patient advocate may make a decision to withhold or withdraw treatment which would allow a patient to die only if the patient has expressed in a clear and convincing manner that the patient advocate is authorized to make such a decision, and that the patient acknowledges that such a decision could or would allow the patient's death. [MCL 700.496(7)(d); MSA 27.5496(7)(d).]

[8] Recent polls show increasing support for physician-assisted suicide under certain circumstances. In August, 1993, the Journal of Family Practice reported on a survey conducted by the Harvard School of Public Health that 61 percent of all Americans would vote for an initiative legalizing physician-assisted suicide. Furthermore, 52 percent of Americans would consider such an option if it was legal and they were terminally ill and suffering from great pain.

This sentiment also has support among the medical communities of the United States and other westernized nations. A survey of 156 internists and surgeons revealed that 61 percent agreed that doctors were currently practicing euthanasia by either accelerating death or withholding treatment. See Messinger, *A gentle and easy death: From ancient Greece to beyond* Cruzan *toward a reasoned legal response to the societal dilemma of euthanasia,* 71 Den U L R 175, 201 (1993). Out of 354 physicians responding to a survey conducted by the Medical Journal of Australia, 107 had provided the means by which patients could hasten their deaths. However, the number was twice as high for physicians who thought the law should be changed to allow it in some circumstances. In Britain, 273 physicians responded to a similar survey, and over half would consider physician-assisted suicide in some circumstances if it were legal.

Most recently, voters in the State of Oregon approved a referendum (the Death with Dignity Act) that would allow physician-assisted suicide under carefully regulated circumstances. Physicians may pre-

in *Cruzan, supra* at 289: "Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment."

### B. *PLANNED PARENTHOOD v CASEY*

In *Planned Parenthood v Casey,* the United States Supreme Court reviewed the constitutionality of the Pennsylvania Abortion Control Act and whether its provisions constituted an undue burden on a woman's right to receive an abortion. For our purposes, the most instructive aspect of *Casey* was its reaffirmance of the basic tenets of *Roe v Wade* and a woman's fundamental right to receive an abortion.[9]

The opinion in *Casey* recognized that not all the substantive due process rights were identifiable at the time of the drafting of either the Bill of Rights or the Fourteenth Amendment. The framers of the constitution were also aware of this fact and understood that liberty could not be summarized in a single document, no matter how extensive. Justice

scribe suicide pills to patients with less than six months to live, but only after a second medical opinion and three requests from the patient are received. The patient must also be mentally competent and free from clinical depression.

[9] In *Casey,* 112 S Ct 2804, the Court reaffirmed *Roe's* essential three-part holding:

First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger a woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

Harlan's assertion in *Poe v Ullman* illustrates this principle best:

> "[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. *This 'liberty' is not a series of isolated points* pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. *It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints,* . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgments." [*Casey*, 112 S Ct 2805, quoting *Poe v Ullman*, 367 US 497, 543; 81 S Ct 1752; 6 L Ed 2d 989 (1961) (Harlan, J., dissenting). Emphasis added.]

Thus, determining the existence of a liberty right involves a textual examination of the constitution, an inward examination of a jurist's beliefs, and an analysis of public inclinations.

Justice O'Connor maintained:

> The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule. . . . *"Due process has not been reduced to any formula* . . . ." [*Casey*, 112 S Ct 2806. Emphasis added.]

Even without a formulaic approach, reasoned

judgment coupled with guidance from the following language of *Casey* provides some insight regarding the existence of the right asserted here:

> Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. *At the heart of liberty is the right to define one's own concept of existence,* of meaning, of the universe, and of the mystery of human life. [*Id.,* 112 S Ct 2807. Emphasis added.]

In the ordinary course of existence, some decisions remain so personal in nature that society is not in a position to make judgments about their appropriateness. It is difficult to imagine a more personal or intimate choice than determining the nature or extent of one's suffering during a terminal illness. A person's conscience, coupled with the advice of an informed and personally chosen physician, is the appropriate decision-making method.

Therefore, under the *Casey* "undue burden" analysis, I believe that the statute is facially invalid because it prohibits *all* physician-assisted suicide. As established in the right to die cases, a person has the right to determine the extent of his suffering when faced with an inevitable death. A complete ban on physician-assisted suicide represents an "undue burden" on the right of the terminally ill to end their suffering through physician-prescribed medications. As in *Casey,* an infringement of a fundamental right by the state

that completely bars the exercise of that right cannot pass constitutional muster.[10]

Dr. Kevorkian asks this Court to find that there is a constitutional right for a suffering person to commit suicide with the assistance of a physician. However, I do not believe that people can always make competent decisions regarding their fate while suffering because too often there are circumstances in which such decisions would be later regarded as mistakes.

Plaintiffs ask this Court to recognize that a terminally ill person has a fundamental right to hasten an inevitable death. To the extent that the plaintiff asks this Court to recognize that a terminally ill person has an absolute right to make a choice to hasten an inevitable death, I believe this swings the pendulum too far. Instead, I would conclude that a terminally ill person has such a right only if the person has made a competent

---

[10] In the only other case directly addressing the constitutionality of an assisted suicide law, *Compassion in Dying v Washington, supra,* the court was asked to rule on the constitutionality of the State of Washington's assisted suicide law.

The court stated that abortion raises even more difficult questions about competing interests than does suicide by the terminally ill. "In reproductive rights cases, there is not only the interest of the pregnant woman seeking an abortion, but also the potential life interest which cannot speak for itself. By contrast, in the case of assisted suicide involving a competent person, only one life is involved and that individual can voice his or her wishes." *Id.* at 1460. Significantly, the court found that the "concept of existence" language from *Casey* was "almost prescriptive" of recognizing the right of an individual to commit suicide. *Id.* at 1459, citing *Casey, supra,* 112 S Ct 2807.

The court concluded:

"[T]he suffering of a terminally ill person cannot be deemed any less intimate or personal, or any less deserving of protection from unwarranted governmental interference, than that of a pregnant woman. Thus, consonant with the reasoning in *Casey,* such an intimate personal decision *falls within the realm of the liberties constitutionally protected under the Fourteenth Amendment.*" [*Id.* at 1460. Emphasis added.]

decision and is suffering from great pain.[11] Because
plaintiffs are in a position to meet such a require-
ment, the Court ought not allow the prospect of
reversal by the United States Supreme Court to
inhibit the analysis of the very real constitutional
claims presented by the plaintiffs. Beyond this
criteria, I would hold that the state may assert its
interest to preserve life as well as other estab-
lished interests. Therefore, because the statute
completely prohibits physician-assisted suicide, I
believe that it is facially invalid.

This, of course, is not to say that the state does
not have a readily identifiable interest in this
area. The state has a legitimate interest in the
preservation of the lives of its citizenry. However,
the interests are not all-encompassing interests
that would allow a blanket ban on physician-
assisted suicide. "The Constitution imposes on this
Court the obligation to 'examine carefully . . . the
extent to which [the legitimate government inter-
ests advanced] are served by the challenged
regulation.' " *Cruzan* at 303 (Brennan, J., dissent-
ing, quoting *Moore v East Cleveland, supra* at
499). The interest in the preservation of life that is
advanced by the state in the present case is not
served by preserving the life of a person who will
inevitably die and is suffering intolerable pain.

## II. THE STATE'S INTEREST

While it is arguable that each of us possesses the
right to commit suicide because suicide is no lon-
ger criminally punishable, such a right, if it exists,
is not absolute when a third party is involved.

---

[11] I have signed my colleague's opinion (LEVIN, J., concurring in
part and dissenting in part), and recognize that a person who is
terminally ill and suffering from great pain *and is facing an immi-
nent death* falls within the confines of the due process right I would
recognize here.

Indeed, protecting the rights and interests of third parties underpins both our constitutional doctrine and criminal laws. Accordingly, I do not embrace the suggestion that because a person may have the right to commit suicide, he also has an unconditional constitutional right to physician-assisted suicide. Rather, the right to physician-assisted suicide must be balanced against the countervailing interests of the state and society.

There are four main interests in this area that may be asserted by the state: (1) the preservation of life, (2) the protection of innocent third parties, (3) the prevention of suicide, and (4) the maintenance of the ethical integrity of the medical profession. *In re Rosebush,* 195 Mich App 675, 681; 491 NW2d 633 (1992); *In re Conroy,* 98 NJ 321; 486 A2d 1209 (1985); *Donaldson v Lundgren,* 2 Cal App 4th 1614, 1620; 4 Cal Rptr 2d 59 (1992); *Cruzan* at 269-271. See also anno: *Judicial power to order discontinuance of life-sustaining treatment,* 48 ALR4th 67. These authorities have uniformly maintained that a " 'state's interest in the preservation of life has been held to be insufficient to outweigh the individual right where the life which would be preserved would be one in a merely vegetative state or one enduring only a prolonged process of dying . . . .' " *Rosebush* at 681, n 2. Similarly, there does not exist a sufficiently compelling justification for the infringement of the right of a competent, terminally ill person suffering from great pain to hasten death through physician-prescribed medications.

As a person's illness progresses to the point of facing an inevitable death while suffering great pain, the state cannot put forth a sufficient rationale to completely proscribe physician-assisted suicide. In *Brophy v New England Sinai Hosp,* 398 Mass 417, 433; 497 NE2d 626 (1986), the Massa-

chusetts Supreme Judicial Court balanced the
state's interest in the preservation of human life
against the right of self-determination and individ-
ual autonomy. The court noted that the state's
interest ordinarily involves the prolongation of
human life and that that interest is "very high
when 'human life [can] be saved where the afflic-
tion is curable.'" Quoting *Superintendent of
Belchertown State School v Saikewicz*, 373 Mass
728, 742; 370 NE2d 417 (1977). However, the court
further noted that this interest diminishes as the
prognosis for recovery wanes. *Brophy*, 398 Mass
433. Thus, when a person is suffering from a
terminal disease, the state should avoid subjective
judgments concerning the quality of that person's
life.[12]

The state may also require that such decisions
be made competently.[13] Such a requirement has
been fashioned by previous courts as well. In
*Application of President & Directors of George-
town College, Inc*, 118 US App DC 80; 331 F2d
1000 (1964), the court denied the right of patients
to refuse lifesaving treatment for themselves in

[12] See also *Quinlan, supra* at 41.

> We think that the State's interest . . . weakens and the
> individual's right to privacy grows as the degree of bodily
> invasion increases and the prognosis dims. Ultimately there
> comes a point at which the individual's rights overcome the
> State interest.

Moreover, in the abortion context, "*Roe v Wade* was less a judg-
ment about the relative importance of maternal liberty and fetal life,
than it was a decision about *who* should make judgments of that
sort." Tribe, Constitutional Law, *supra*, p 1352 (contending that the
decision is personal to the mother, not the state). Here, it is the
individual *who*, in the appropriate circumstances, should make the
decision to hasten death through physician-prescribed medications.

[13] [T]he common-law doctrine of informed consent is viewed as
generally encompassing the right of a competent individual to
refuse medical treatment. [*Cruzan, supra* at 277.]

circumstances strongly suggesting that they lack the time or the capacity for reflection on the matter, so that the course least likely to do irreversible harm was an insistence on proceeding with treatment.

Patients have been denied the right to refuse life-sustaining medical treatment where they did not have the capacity or an adequate opportunity to reflect on the finality of the decision. See, e.g., *Osgood v Dist of Columbia,* 567 F Supp 1026 (D DC, 1983). Additionally, the *Quinlan* court suggested that a person in extreme shock or pain is incapable of making a truly informed decision. 70 NJ 39, citing *John F Kennedy Memorial Hosp v Heston,* 58 NJ 576; 279 A2d 670 (1971).

Dr. Kevorkian's actions are within the scope of the state's protected interests. To the extent that a country sanctions the assisted suicide of the suffering, it does so at the risk of harm to its most vulnerable of citizens: e.g., the elderly and the clinically depressed.

Furthermore, extending the right to any suffering person making a rational decision almost begs the question. It has been widely acknowledged that most individuals who attempt suicide are suffering from depression, hopelessness, or lack of social interaction. Often such attempts are merely "cries for help." There are also socioeconomic pressures on individuals that make them consider suicide as a means of relief. Circumstances such as grief, prejudice, oppression, or teenage stress are often the reasons cited by people attempting suicide. Marzen, O'Dowd, Crone & Balch, *Suicide: A constitutional right?,* 24 Duq L R 1 (1985).

Therefore, the state has a right to legislate in this area. However, the state's interests diminish as death nears for a terminally ill person; the interests are no longer sufficient to outweigh an

individual's right to self-determination. Such an outcome would be consistent with *Compassion in Dying, supra,* in which the court recognized the right of mentally competent, terminally ill adults to knowingly and voluntarily hasten their deaths.

### III. CONCLUSION

The statute at issue should be deemed facially invalid because it bans all assisted suicides. A terminally ill individual who is suffering from great pain and who has made a competent decision should have a constitutional due process right to hasten his death. Because plaintiffs are in a position to now make a choice that I believe should survive any challenge from the state, I would hold that the statute represents an undue burden on that right.

The assumption that the recognition of this right would be problematic in its administration is not an appropriate consideration when determining the existence of a fundamental right. Indeed, constitutional litigation often creates the necessity to draw abstract lines that in practice are not easily workable. Nevertheless, the recognition of fundamental rights requires choices in these areas that are not readily ascribable to any particular administrative device.

We need only look to the development of the living will as an example of guidelines in the death and dying area that work effectively and remain constitutional. Pursuant to MCL 700.496; MSA 27.5496, a competent person already has the right to document the desire to refuse lifesaving medical treatment. While such documentation provides us with the right to refuse life-sustaining treatment, our laws currently do not permit us to choose to end our suffering as we near death

through physician-prescribed medications. If we were allowed such an opportunity, our own reasoned judgment would prevail in each case.

There is no adequate distinction between the right of a terminally ill person to refuse unwanted medical treatment and the right to physician-assisted suicide. There is no sense in disallowing the competent choice to have a physician intervene to relieve intolerable suffering at the end of one's life. Furthermore, such a result conflicts with what many of us would desire when faced with severe pain and an inevitable death.

Many citizens of this state are disturbed by defendant Kevorkian's crusade and, at the same time, wish to see a resolution of the difficulties facing the terminally ill. Perhaps even more troubling is that, under this law, an individual is forbidden from consulting with a private, trusted physician about such matters. The recognition of a right to make such private decisions with a trusted physician would allow open and honest discussion with the patient of all options and consequences.

Substantive due process cases invariably address those rights that are considered so fundamental that they cannot be unduly burdened by the state. Here, it is fundamentally wrong not to allow a competent, terminally ill person who is suffering from great pain the opportunity to die with some dignity.

Therefore, I would hold that the plaintiffs may assert a constitutional right to physician-assisted suicide if it can be shown that they have made a competent decision and are suffering from great pain. I would further allow, consistent with *Cruzan,* that the state may require proof of such a competent decision by clear and convincing evidence if it chooses to so legislate.

I would reverse the judgment of the Court of

Appeals and allow plaintiffs to document their
intent to receive physician-prescribed medications
should their terminal illnesses progress to the
point of great pain.

LEVIN, J., concurred with MALLETT, J.